[L.A. No. 30730. Feb. 6, 1979.]

Conservatorship of the Person and the Estate of MABEL ROULET.
MAY MORRISON HEAP, as Conservator, etc.,
Petitioner and Respondent, v.
MABEL ROULET, Objector and Appellant.

**COUNSEL**

Glen Mowrer, Jr., Public Defender, Gilbert W. Lentz and Richard Savidge, Deputy Public Defenders, for Objector and Appellant.

Paul Halvonik, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, Quin Denvir, Richard E. Shapiro and Paul D. Fogel, Deputy State Public Defenders, Sheldon Portman, Estella W. Dooley, Samuel L. Williams and Richard J. Kamins as Amici Curiae on behalf of Objector and Appellant.

George P. Kading, County Counsel, and Marvin Levine, Deputy County Counsel, for Petitioner and Respondent.

Keith C. Sorenson, District Attorney (San Mateo), and Joseph H. Clasgens III, Deputy District Attorney, as Amici Curiae on behalf of Petitioner and Respondent.

**OPINION**

BIRD, C. J.—In this case, the court must decide if proof beyond a reasonable doubt and a unanimous jury verdict are the proper standards to apply before a conservator can be appointed under the Lanterman-Petris-Short Act's (LPS Act) grave disability provisions,[1] with the power to involuntarily commit a conservatee to a state mental institution for up to a year.

---

[1]See Welfare and Institutions Code section 5350 et seq. Unless otherwise specified, all statutory references herein are to the Welfare and Institutions Code.

I

In December 1974, respondent, the Public Guardian of the County of Santa Barbara, was named conservator of the person and estate of appellant, Mabel Roulet. Respondent was given the power to confine appellant in a mental institution. Pursuant to respondent's instructions, appellant was placed in Camarillo State Hospital. In November 1975, respondent petitioned under sections 5350 and 5361 to reestablish the conservatorship over appellant for an additional year because of appellant's alleged continuing grave disability due to a mental disorder.

At the time of the recommitment proceeding, appellant was 59 years old. According to the conservatorship reevaluation form filled out by physicians at Camarillo State Hospital, appellant could not provide for her basic needs because "[s]he is so confused, and disorganized that she is unable to make daily living plans. If she has some funds she will waste [*sic*] on cigarettes and drinking." The form indicated that appellant was unwilling to accept treatment voluntarily because ". . . she feels she is not mentally ill."

Pursuant to subdivision (d) of section 5350, appellant demanded a jury trial on the issue of whether she was gravely disabled. At trial appellant requested that the jury be instructed that a conservator could be appointed for her only if the jury unanimously agreed, beyond a reasonable doubt, that appellant was gravely disabled as the result of mental disorder. The trial judge refused this instruction. Instead he instructed the jury they need only apply the preponderance of the evidence standard and that only 9 of the 12 jurors must agree in order to reach a verdict. Subsequently the jury found appellant to be a gravely disabled person.[2]

The trial court entered an order reestablishing the conservatorship and granted respondent numerous powers including the power to institutionalize appellant (i.e., to continue her commitment), and to require her to receive treatment related specifically to remedying her "grave disability." (§ 5358.) The court further ordered that appellant lose the privilege of possessing a driver's license and the right to enter into contracts without the consent and approval of the conservator. (§ 5357.)

---

[2]How the jury voted is not entirely clear from the record. The clerk's transcript contains the verdict returned by the jury, but that form does not indicate the number of jurors concurring. The minute entry of the hearing does not show that the jury was polled. The order appealed from indicates that the verdict was unanimous.

This appeal followed. The Court of Appeal reversed the order reestablishing the conservatorship, unanimously holding that the reasonable doubt standard must be applied. Thereafter, this court granted the conservator's petition for hearing.

## II

In criminal trials, proof of guilt beyond a reasonable doubt is an obstacle the state places in its own way, in order to lessen the possibility of convicting an innocent person. This procedural constraint is eloquent testimony to the high stakes involved—a defendant's freedom and reputation hinge on the verdict. In *People* v. *Burnick* (1975) 14 Cal.3d 306, 319-322 [121 Cal.Rptr. 488, 535 P.2d 352], this court explicitly recognized that civil commitment to a mental hospital, despite its civil label, threatens a person's liberty and dignity on as massive a scale as that traditionally associated with criminal prosecutions. One has only to imagine the horror experienced by a competent person falsely committed as mentally disturbed in order to appreciate that freedom is openly on trial at a civil commitment proceeding. Therefore, the *Burnick* court ruled that proof beyond a reasonable doubt applies to mentally disordered sex offender proceedings.

■ The logic of *Burnick* is equally applicable here. The appointment of a conservator for appellant and her subsequent confinement in a mental hospital against her will deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation.

### A. Deprivation of Liberty

The extent to which liberty is at stake can be ascertained by reviewing exactly what awaits an individual subjected to a grave disability proceeding. When the establishment of a conservatorship is recommended, the court may appoint a temporary conservator who has the power to keep the individual in a treatment facility for up to six months pending the outcome of a trial on the issue of grave disability. (§§ 5352.1, 5353.) If the individual is found to be "gravely disabled," the court then appoints a conservator and specifies the powers which the conservator will possess. (§§ 5357, 5358.) One of the principal powers which the court may grant a conservator is the right to place a conservatee in an institution. Unlike a person who is found to be imminently dangerous to others and can be confined for a maximum of 90 days before a new court order must issue

(§§ 5300-5306),[3] the person who is found to be gravely disabled can be involuntarily confined in a mental hospital for up to a year by his or her conservator, with the possibility of additional year-long extensions. (§§ 5358, 5361.) The period of temporary conservatorship is not included in the one-year period. (§ 5361.) If the conservator petitions to reestablish an expiring conservatorship, the court may order the conservatee confined past the termination date until renewal proceedings are completed. (§ 5361.) In effect, these statutes assure in many cases an unbroken and indefinite period of state-sanctioned confinement. "The theoretical maximum period of detention is *life* as successive petitions may be filed . . . ." (*In re Gary W.* (1971) 5 Cal.3d 296, 300 [96 Cal.Rptr. 1, 486 P.2d 1201], italics added.)

This court has previously recognized that inmates of state mental hospitals face serious restrictions on their freedom. In *In re Roger S.* (1977) 19 Cal.3d 921, 929 [141 Cal.Rptr. 298, 569 P.2d 1286], the court noted that involuntary confinement is a direct form of physical restraint. And "[i]t is beyond dispute that a principal ingredient of personal liberty is 'freedom from bodily restraint' [citation]. . . ." (*Id.,* at p. 927.) In *People* v. *Burnick, supra,* 14 Cal.3d 306, 323, a federal court of appeals opinion was cited to emphasize " 'the indisputable fact that civil commitment entails a "massive curtailment of liberty" in the constitutional sense. [Citation.] The destruction of an individual's personal freedoms effected by civil commitment is scarcely less total than that effected by confinement in a penitentiary.' "

Again, in *People* v. *Olivas* (1976) 17 Cal.3d 236, 244-245 [131 Cal.Rptr. 55, 551 P.2d 375], this court stated, "While wards confined in institutions of the Youth Authority may often experience greater freedom within the institution than individuals confined in state prisons or *mental hospitals* [citation], they are nevertheless incarcerated against their will, a most basic form of personal liberty deprivation." (Italics added.)

Respondent fails to distinguish these previous decisions of this court. Instead, respondent takes false comfort in the fact that appellant's commitment is only a "civil" confinement for remedial purposes.

---

[3] "The definite impression of many data gatherers is that the conservatorship device is used to avoid the necessity of obtaining consent to treatment from recalcitrant patients. One can only speculate on the number of people who are coerced into accepting 'voluntary' treatment by a threat to initiate the conservatorship process if the individual is unwilling to accept treatment." (Morris, *Conservatorship for the "Gravely Disabled": California's Nondeclaration of Nonindependence* (1978) 15 San Diego L.Rev. 225 (hereafter cited as *Conservatorship for Gravely Disabled*).)

However, these are mere labels. Appellant's stay in Camarillo State Hospital was not any less involuntary because the state called her incarceration by one name rather than another. As the United States Supreme Court has authoritatively written, "commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' " (*In re Gault* (1967) 387 U.S. 1, 50 [18 L.Ed.2d 527, 558, 87 S.Ct. 1428].) In a subsequent opinion, the Supreme Court reiterated that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards . . . ." (*In re Winship* (1970) 397 U.S. 358, 365-366 [25 L.Ed.2d 368, 376, 90 S.Ct. 1068].)

This court has also rejected reliance on a civil label. "[B]ecause involuntary commitment is incarceration against one's will regardless of whether it is called 'civil' or 'criminal' [citation], the choice of standard of proof implicates due process considerations which must be resolved by focusing not on the theoretical nature of the proceedings but rather on the actual consequences of commitment to the individual." (*People* v. *Thomas* (1977) 19 Cal.3d 630, 638 [139 Cal.Rptr. 594, 566 P.2d 228]; see also *People* v. *Burnick, supra,* 14 Cal.3d 306, 315-316; *In re Gary W., supra,* 5 Cal.3d 296, 307 ["the California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings . . . ."].)

Nor can this court be swayed by the fact that appellant had her liberty taken away, allegedly for her own good. " 'Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action taken.' " (*Breed* v. *Jones* (1975) 421 U.S. 519, 530, fn. 12 [44 L.Ed.2d 346, 356, 95 S.Ct. 1779].) The law must still strive to make certain that only those truly unable to take care of themselves are being assigned conservators under the LPS Act and committed to mental hospitals against their will. As Justice Brandeis cautioned a half-century ago, "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." (*Olmstead* v. *United States* (1928) 277 U.S. 438, 479 [72 L.Ed. 944, 957, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.).)

Therefore, appellant's protection ultimately must rest on requiring the state to match its good intentions with proof beyond a reasonable doubt

that appellant is in need of the state's care. If a person is in fact incapable of providing for the daily necessities of life, this should not prove an insurmountable burden for the petitioner to carry.

The concurring and dissenting opinion today relies on the argument that confinement of an allegedly gravely disabled person is ". . . never in a jail, prison, or an institutional environment designed for the punishment of persons convicted of crimes." (Conc. and dis. opn., *post,* at p. 238.)

However, recent statistics from the California Department of Health (Ann. Rep., State Hospitals for the Mentally Disordered (1975-1976) Center for Health Statistics (Apr. 1977) table 23, p. 40, hereafter cited as Ann. Rep.) indicate that conservatees under the LPS Act are frequently placed at Atascadero and Patton State Hospitals. As of June 30, 1976, these institutions contained approximately 60 percent and 40 percent, respectively, of those persons convicted of crimes and determined to be mentally disordered sexual offenders (see § 6300 et seq.). Hence, conservatees do often find themselves confined in the same place as those convicted of crimes. During fiscal year 1975-1976, for example, out of the 1,325 conservatees admitted to state hospitals under sections 5358 and 5353, 23 were admitted to Atascadero and 140 to Patton. (Ann. Rep., *supra,* table 22, p. 39.) Of the 1,956 total inpatient conservatees in the state hospitals on June 30, 1976, 102 were at Atascadero and 126 were at Patton. (*Id.,* table 23, p. 40.) The 102 conservatees at Atascadero comprised almost 10 percent of the total population of that institution (1,045), and the 126 at Patton comprised more than 15 percent of the total population of that hospital (823). (*Ibid.*)

In *Burnick,* this court soberly recognized the resemblance in reality between Atascadero State Hospital and a conventional prison. "Let us not deceive ourselves as to the nature of that institution. (Cf. *In re Gault, supra,* 387 U.S. 1, 27 [18 L.Ed.2d 527, 545-546].) It was frankly described as follows by a distinguished body of the medical profession. 'In its physical appearance, this is much more like a prison than a hospital. In its architectural planning, it disregards the modern psychiatric concept of the therapeutic community. There are bare corridors, bars, iron gates, rows of cells—all the stigmata of punishment rather than treatment. Patients who occupy individual rooms are locked out of them during the day and have no opportunity to withdraw for privacy. Patients in wards have a reasonable amount of mobility from one area of the hospital to another, although security precautions are in evidence everywhere. . . . [¶] Externally, the plant has a misleadingly attractive appearance.

Internally, despite its dehumanizing attributes, it is well-maintained and well-equipped and might be characterized as a sanitary dungeon.' Other observers have confirmed this description." (Fns. omitted.) (*People* v. *Burnick, supra,* 14 Cal.3d 306, 319-320.)

Therefore, the mere fact that appellant found herself confined in a hospital rather than a prison does not eliminate the need to protect her against *false* confinement.

The gravely disabled person for whom a conservatorship has been established faces the loss of many other liberties in addition to the loss of his or her freedom from physical restraint. For example, the conservator[4] is also given the powers granted to the guardian of an incompetent in chapters 7, 8 and 9 of division 4 of the Probate Code. (§ 5357; Prob. Code, § 1852.) These include: payment of the conservatee's debts and collection or discharge of debts owed the conservatee (Prob. Code, § 1501); management of the conservatee's estate, including sale or encumbrance of the conservatee's property (Prob. Code, §§ 1502, 1530); commencement, prosecution, and defense of actions for partition of the conservatee's property interests (Prob. Code, §§ 1506-1508); disposition of the conservatee's money or other property for court-approved compromises or judgments (Prob. Code, §§ 1510, 1530a); deposit of the conservatee's money in a bank, savings and loan institution, or credit union (Prob. Code, § 1513); the giving of proxies to vote shares of the conservatee's corporate stocks (Prob. Code, § 1517); and the borrowing of money when it will benefit the conservatee (Prob. Code, § 1533). In addition, the court may grant the conservator any or all of the powers specified in Probate Code section 1853.[5] (See § 5357.)

---

[4]"A report on LPS conservatorships in Santa Clara County revealed that a majority of conservatees had no personal contact with their conservators, and in fact they did not even know their names. [Fn. omitted.]" (Morris, *Conservatorship for Gravely Disabled, supra,* 15 San Diego L.Rev. 227.)

[5]These powers are as follows: "To institute and maintain all actions and other proceedings for the benefit of and to defend all actions and other proceedings against the conservatee or the conservatorship estate; to take, collect and hold the property of the conservatee; to contract for the conservatorship and to perform outstanding contracts and thereby bind the conservatorship estate; to operate at the risk of the estate any business, farm or enterprise constituting an asset of the conservatorship, to grant and take options; to sell at public or private sale; to create by grant or otherwise easements and servitudes; to borrow money and give security for the repayment thereof; to purchase real or personal property; to alter, improve and repair or raze, replace and rebuild conservatorship property; to let or lease property for any purpose including exploration for and removal of gas, oil and other minerals and natural resources and for any period, including a term commencing at a future time; to loan money on adequate security; to exchange conservatorship property; to sell on credit provided that any unpaid portion of the selling

Further an individual found to be "gravely disabled" may suffer numerous statutory disabilities, including possible loss of the following rights:[6] to remain licensed to practice a profession (e.g., law (Bus. & Prof. Code, § 6007, subd. (a)); medicine (Bus. & Prof. Code, §§ 2416, 2417); to continue to hold certain public offices (Gov. Code, § 1770, subd. (b)); to remain employed as a teacher (Ed. Code, §§ 44932, 87732); to establish or maintain certain relationships (e.g., custody of children (Civ. Code, § 232, subd. (a)(6)); marriage (Civ. Code, §§ 4201, 4506); to object to sterilization (§ 7254); to refuse certain types of medical treatment (§§ 5357, subds. (c), (d), 5358); to possess a driver's license (§ 5357, subd. (a)); to own or possess firearms (§§ 8100, 8102, 8103); to remain registered to vote (Elec. Code, § 701); and to enter into contracts (§ 5357, subd. (b))).

As this review illustrates, there can be no question that a finding of grave disability may result in serious deprivation of personal liberty. Indeed, a conservatee may be subjected to greater control of his or her life than one convicted of a crime.

## B. STIGMA

The second issue which must be resolved is whether any "stigma" attaches when an individual is found to be gravely disabled due to a mental disorder. Respondent argues that the public attitude toward a gravely disabled person is one of "sympathy." Unfortunately, this is not completely accurate. There is compelling evidence, which this court acknowledged in *Burnick,* that society still views the mentally ill with suspicion.

---

price shall be adequately secured; to vote in person or by proxy all shares and securities held by the conservator; to exercise stock rights and stock options; to participate in and become subject and to consent to the provisions of any voting trust and of any reorganization, consolidation, merger, dissolution, liquidation or other modification or adjustment affecting conservatorship property; to effect necessary insurance for the proper protection of the estate, to pay, collect, compromise, arbitrate or otherwise adjust any and all claims, debts or demands upon the conservatorship, including those for taxes; to abandon valueless property, and to employ attorneys, accountants, investment counsel, agents, depositaries and employees and to pay the expense therefor from the conservatorship estate." (Prob. Code, § 1853.)

[6]The statutes cited utilize several different phrases to refer to impairments resulting from mental disorders. Although these terms are not always identical to the language of the grave disability provisions of the LPS Act, a finding of grave disability would certainly be relevant to a determination of whether an individual falls within the ambit of these statutory provisions.

"In the ideal society, the mentally ill would be the subjects of understanding and compassion rather than ignorance and aversion. But that enlightened view, unfortunately, does not yet prevail. The stigma borne by the mentally ill has frequently been identified in the literature: 'a former mental patient may suffer from the social opprobrium which attaches to treatment for mental illness[7] and which may have more severe consequences than do the formally imposed disabilities. Many people have an "irrational fear of the mentally ill." The former mental patient is likely to be treated with distrust and even loathing; he may be socially ostracized and victimized by employment and educational discrimination. Finally, the individual's hospitalization and posthospitalization experience may cause him to lose self-confidence and self-esteem. [¶] The legal and social consequences of commitment constitute the stigma of mental illness, a stigma that could be as socially debilitating as that of a criminal conviction.' (Fns. omitted.) (*Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1200-1201; accord, Rosenhan, *On Being Sane in Insane Places* (1973) 13 Santa Clara Law. 379, 385, and authorities cited in fn. 11.)" (*People* v. *Burnick, supra,* 14 Cal.3d 306, 321.)

Recently this court recognized the stigma which attaches to an individual who is found to be mentally ill. "Not only is there physical restraint [when an individual is confined in a mental hospital], but there is injury to protected interests in reputation [citations], an interest in not being improperly or unfairly *stigmatized* as mentally ill or disordered." (*In re Roger S., supra,* 19 Cal.3d 921, 929, italics added.)

Moreover, grave disability proceedings carry special threats to reputation. A finding of grave disability is equivalent to a finding that a person is unable to feed, clothe or house himself because of a mental disorder (§ 5008, subd. (h)(1)). It is implausible that a person labelled by the state as so totally ill could go about, after his release, seeking employment, applying to schools, or meeting old acquaintances with his reputation fully intact.

A consistent line of cases decided by the United States Supreme Court and by this court require us to reject respondent's reliance on "civil" labels and to hold that since grave disability proceedings "seriously put at

---

[7] In a study of stigma and mental illness, stigmatization was found to result from the categorization of a person as mentally ill rather than from the nature of that person's behavior. (Sarbin & Mancuso, *Failure of a Moral Enterprise: Attitudes of the Public Toward Mental Illness* (1970) 35 J. Consul. & Clinical Psych. 159.)

risk both the personal liberty and the good name of the individual, the safeguard of proof beyond a reasonable doubt is required." (*People* v. *Thomas, supra,* 19 Cal.3d 630, 638.)

## III

█ The civil nature of grave disability proceedings is likewise an insufficient excuse for allowing a person to lose his liberty and good name at the hands of less than a unanimous jury. Under the trial judge's ruling, appellant theoretically could have been certified as gravely disabled and committed to a mental hospital, even though 3 of the 12 jurors found her perfectly sane. No defendant in a criminal case in California goes to prison after such a split jury vote. Yet, we have already seen that commitment equals imprisonment in its impact on a person's freedom. The inescapable conclusion is that the right to a unanimous jury verdict applies to conservatorship proceedings under the LPS Act. Any other result would mock the care our legal system has historically taken to guard against incarcerating the wrong person.

The need for unanimous jury verdicts is all the more apparent when one considers the uncertainties that still surround psychiatric diagnoses. This court has recently noted that "the divergence of expert views . . . render[s] the possibility of mistake significantly greater [in the diagnosis of mental illness] than in diagnosis of physical illness." (*In re Roger S., supra,* 19 Cal.3d 921, 929.)[8] Against this background of expert fallibility, the law must require, at a minimum, the jurors to agree among themselves that a diagnosis of grave disability was accurately made in a particular case.

In *People* v. *Feagley* (1975) 14 Cal.3d 338, 351 [121 Cal.Rptr. 509, 535 P.2d 373], this court noted that a defendant in a mentally disordered sex offender proceeding was entitled to a unanimous jury verdict for "the same reasons" that he was entitled to the standard of proof beyond a reasonable doubt. In *People* v. *Thomas, supra,* 19 Cal.3d 630, 644, this court again noted that a person threatened with civil commitment was entitled to a unanimous jury verdict for "identical reasons" to those which entitled him to have his alleged narcotics addiction proved beyond a reasonable doubt.

---

[8]See also *People* v. *Burnick, supra,* 14 Cal.3d 306, 325-326; *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 579 [45 L.Ed.2d 396, 409, 95 S.Ct. 2486] (conc. opn. of Burger, C. J.); Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom* (1974) 62 Cal. L.Rev. 693, 699-708.

Thus, this court has twice explicitly recognized that jury unanimity and the standard of proof beyond a reasonable doubt are slices of the same due process pie. It would be curious indeed to grant appellant one without the other. Therefore, this court concludes that appellant is entitled to a unanimous jury verdict for reasons identical to those which entitle her to the standard of proof beyond a reasonable doubt.

Moreover, any interpretation of section 5350, subdivision (d) as *not* requiring a unanimous jury verdict would render that section unconstitutional as a violation of the equal protection clauses of the California and federal Constitutions.[9] Section 5303 explicitly extends the protection of unanimous jury verdicts to commitment proceedings for imminently dangerous persons. Were gravely disabled persons facing possible commitment not entitled to the same protection, they would have just cause to complain.

This court has previously characterized the right to a unanimous jury verdict as "fundamental." (*People* v. *Feagley, supra,* 14 Cal.3d 338, 356.)[10]

---

[9]It is a cornerstone of constitutional adjudication that courts interpret statutes, wherever possible, so as to preserve their constitutionality. (See, e.g., *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 305 [138 Cal.Rptr. 53, 562 P.2d 1302].)

[10]The concurring and dissenting opinion seeks to distinguish *Feagley* on the grounds that "[t]he defendant there had been charged with and convicted of a criminal offense as a precondition to proceedings to determine his status as a mentally disordered sex offender." (Conc. and dis. opn., *post,* p. 241, italics added.) However, the *Feagley* court explicitly disclaimed reliance on the fact that the civil commitment of a mentally disordered sex offender is triggered by a criminal conviction. "[T]he criminal offense of which the defendant was convicted need have no relevance at all to the issues subsequently adjudicated in the mentally disordered sex offender proceedings." (*People* v. *Feagley, supra,* 14 Cal.3d 338, 356.) *Feagley* specifically concluded that a person alleged to be a mentally disordered sex offender has a fundamental right to a unanimous jury verdict in *civil commitment proceedings.* (*Ibid.*)

One would have thought that the concurring and dissenting opinion's misreading of *Feagley's* significance would have been laid to rest by these words of explanation by Justice Mosk, *Feagley's* author: "The primary ground of invalidity identified in *Feagley* was a violation of the provisions of the California Constitution guaranteeing due process (art. I, § 7, subd. (a)) and a unanimous jury verdict (art. I, § 16). *We recognized that neither applied by its terms to 'civil' actions,* but we recalled our statement in *In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201], that 'the California Legislature has recognized that the *interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings* and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction.' We then explained that a mentally disordered sex offender proceeding has 'all the trappings of a criminal prosecution, together with the worst consequences of the latter' (14 Cal.3d at p. 350) . . . ." (*People* v. *Thomas* (1977) 19 Cal.3d 630, 642 [139 Cal.Rptr. 594, 566 P.2d 228], italics added.)

This court today does not "assum[e] the very thing at issue." (Conc. and dis. opn., *post,* p. 241.) Instead, having undertaken a close analysis of the severe consequences for an individual's liberty of commitment to a mental hospital as a gravely disabled person, this

Accordingly, the state must show the "compelling interest" which would justify distinguishing between the rights of imminently dangerous and gravely disabled persons. (*In re Gary W., supra,* 5 Cal.3d 296, 306.)

Respondent fails to demonstrate any such compelling interest. At most, respondent argues that there is a rational basis for distinguishing between the two classes of mentally ill persons. The alleged basis is that in grave disability proceedings, the state's interest is solely one of benevolence toward the individual. In imminently dangerous proceedings, on the other hand, the government has the additional adversary interest of protecting others from that individual. Respondent concludes that there is less danger of governmental abuse in grave disability proceedings given the benevolent state motives. Therefore, there is supposedly less need for heightened due process protection.

This argument is spurious. History is haunted by the accusing cries of those locked away "for their own good." It would be small solace to a person wrongly judged mentally incompetent that his road to commitment was paved with good intentions.

Moreover, this court has previously questioned whether the reality of commitment conforms to its benign purpose. (*People* v. *Burnick, supra,* 14 Cal.3d 306, 319-320.) In many cases the "promise of treatment has served only to bring an illusion of benevolence to what is essentially a warehousing operation for social misfits." (*Cross* v. *Harris* (D.C.Cir. 1969) 418 F.2d 1095, 1107.) For these reasons, respondent's rational basis argument must be rejected.

Common sense alone dictates that, if anything, grave disability proceedings should be hemmed in by more procedural safeguards than those surrounding imminently dangerous proceedings. This is because the LPS Act makes it *easier* to commit gravely disabled persons than imminently dangerous persons. In grave disability proceedings, the trier of fact need only be presented with a general showing that the individual cannot provide for his or her basic personal needs due to a mental disorder. (§ 5008, subd. (h)(1).) However, a much more exact showing must be made in imminently dangerous proceedings, which require the demonstration of a threatened, attempted, or actually inflicted physical

court today follows *Feagley* and *Thomas* in characterizing as fundamental the right to a unanimous jury verdict in civil commitment proceedings under the LPS Act.

harm on another person, as well as an imminent threat of substantial physical harm to others by reason of a mental disorder. (§ 5304.)[11]

The easier the path to commitment, the more likely becomes the possibility of mistake. As the possibility of reaching a wrong decision increases, the number of juror votes required to commit a person certainly should not decrease. To allow a person to be certified as gravely disabled by 9 of 12 jurors, while requiring a jury to agree unanimously before a person can be found imminently dangerous, would be to stand the doctrine of equal protection on its head.

In *People* v. *Feagley, supra,* 14 Cal.3d 338, 358, this court reached a parallel conclusion regarding the unanimous jury verdict rights of mentally disordered sex offenders. The court noted that it was easier to commit mentally disordered sex offenders than those accused of being dangerous to others. The court concluded, as we do today, that surrounding the *easier* path to commitment with *less* procedural safeguards was nonsensical. "This is common sense turned upside down, a discrimination without semblance of rational basis—let alone a compelling state interest, and a wholesale denial of equal protection of the laws under both the California and federal Constitutions." (Fn. omitted.) (*People* v. *Feagley, supra,* 14 Cal.3d 338, 358.)

## IV

There is an additional consideration involved in the case before this court. Since a major function of standards of proof is to ensure the correctness of the eventual verdict[12] an examination of the extent to which LPS Act conservatorship procedures are subject to factual distortions is helpful in showing why a high standard of proof is necessary to offset the effect of those distortions.

A proposed conservatee's only opportunity to prove his mental competency is at trial on the issue of grave disability. In the typical case

---

[11]It is also more difficult for an individual found to be gravely disabled to secure his or her release. A conservatee may be confined for up to a year, compared to the 90-day maximum for a person adjudged imminently dangerous. Moreover, only one additional 90-day period of treatment may be ordered by the court for an imminently dangerous person and even then only if that person has threatened, attempted, or actually inflicted physical harm on another during the initial 90-day period. (§ 5304; *People* v. *Feagley, supra,* 14 Cal.3d 338, 358, fn. 14.) Conservatorship, on the other hand, may be reestablished for additional one-year periods an indefinite number of times, as long as the condition of grave disability is found to continue. (§ 5361.)

[12]See, e.g., Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases* (1977) 86 Yale L.J. 1299, 1306-1307.

(including the case at bar), the potential conservatee is placed at an initial disadvantage because he or she is likely to be confined prior to the trial—either pursuant to a temporary conservatorship (§ 5353) or the conservatorship which is to be reestablished (§ 5358). These constraints limit the individual's ability to communicate freely with counsel, witnesses, and others in preparation for trial.

Moreover, the individual's pretrial behavior during confinement can be and normally is introduced at the grave disability hearing to help justify predictions that the individual is and will continue to be gravely disabled. However, an individual's frantic or desperate reactions to involuntary commitment in a mental hospital do not, in themselves, prove that he is mentally ill. (See, e.g., Kesey, One Flew Over the Cuckoo's Nest (1962).)[13] "Mental illness" is generally acknowledged to be a vague and uncertain concept. Categories of mental diseases are notoriously unclear, often overlap, and frequently change.[14] The experts themselves often disagree on what is an appropriate diagnosis. (See p. 230, *ante*.) In addition, the literature reveals that some appointed counsel, regardless of how experienced they may be, tend to play a paternalistic rather than an advocacy role in commitment proceedings.[15] A recent empirical study of practice under the LPS Act confirms this observation.[16]

[13]A recent study of the LPS Act points out that testimony about an individual's failure to adjust in a hospital setting is frequently relied on to support a finding of grave disability. However, such testimony may have little, if any, bearing on the basic question posed to the finder of fact—that is, whether or not the proposed conservatee "as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter" (§ 5008, subd. (h)(1)). (See Warren, *Involuntary Commitment for Mental Disorder: The Application of California's Lanterman-Petris-Short Act* (1977) 11 Law & Society Rev. 629.)

Both judges and juries tend to defer to psychiatric judgments regarding behavior that is purportedly indicative of a mental disorder. (For a recent empirical study noting the deference of the factfinder to psychiatric opinion testimony in civil commitment proceedings in Arizona, see Wexler & Scoville, *The Administration of Psychiatric Justice: Theory and Practice in Arizona* (1971) 13 Ariz. L.Rev. 1, 60.)

[14]In title 9, California Administrative Code, section 813, "mental disorder" is defined as "any of the mental disorders as set forth in the Diagnostic and Statistical Manual of Mental Disorders (Current Ed.) of the American Psychiatric Association." This definition only serves to highlight the lack of standards and potential for confusion, as the American Psychiatric Association frequently alters its definitions of what constitutes a mental disorder. (See, e.g., Jackson, *The Revised Diagnostic and Statistical Manual of the American Psychiatric Association* (1970) 127:1 Am.J.Psych. 65.)

[15]See, e.g., Litwack, *The Role of Counsel in Civil Commitment Proceedings: Emerging Problems* (1974) 62 Cal.L.Rev. 816, 827-831 and authorities cited therein; Andalman & Chambers, *Effective Counsel for Persons Facing Civil Commitment: A Survey, a Polemic, and a Proposal* (1974) 45 Miss.L.J. 43.

[16]The study suggests complacency on the part of appointed counsel. (Warren, *supra*, 11 Law & Society Rev. at p. 633.) A study in North Carolina noted that "[i]nformal

The combined effect of these factors—the difficulty of defining mental illness, the factfinder's deference to psychiatric testimony, and the paternalistic attitude of some appointed counsel[17]—lends strong support to the conclusion that proof beyond a reasonable doubt and jury unanimity are constitutionally mandated standards necessary to assure that LPS Act conservatorships are accurately established.

V

The due process clause of the California Constitution requires that proof beyond a reasonable doubt and a unanimous jury verdict be applied to conservatorship proceedings under the LPS Act. This court's decisions in *Burnick, Feagley* and *Thomas* have already held as much in regard to other civil commitment proceedings. There is no logical reason to diverge from that path in this case. To turn back toward the repudiated criterion of the civil-criminal label serves only to exalt form over constitutional substance. Logic and law, as well as regard for the value of liberty, compel this court to follow those decisions today.[18]

The order appealed from is reversed.

Tobriner, J., Mosk, J., and Newman, J., concurred.

conversations with judges and attorneys suggest that they defer to psychiatric opinion because they feel they lack the requisite expertise and want to obtain help for those in need." (Hiday, *Reformed Commitment Procedures: An Empirical Study in the Courtroom* (1977) 11 Law & Society Rev. 651, 665.)

The Wisconsin Supreme Court has recently mandated minimum standards for attorneys appearing in civil commitment proceedings. Those standards call for "adversary counsel" who must represent a client "zealously within the bounds of the law." (*State* ex rel. *Memmel* v. *Mundy* (1977) 75 Wis.2d 322 [249 N.W.2d 573, 577].)

[17]One recent law review article outlined the present system: "The lawyers did not consider themselves advocates in an adversary process in which conservatorship was to be avoided. For example, of the sixty-three court hearings observed during the study period, thirty-six lasted three minutes or less, and only nine hearings lasted nine minutes or longer. Ironically, the conservatorship hearings were of a shorter average duration than the 4.7 minute average of pre-LPS commitment hearings. The criticism leveled at the commitment hearings is equally applicable to the LPS conservatorship hearings: 'One can only wonder what the court experience meant to more than 13,000 Californians committed last year. If the purposes of the system are so confusing to the judges, doctors and lawyers who practice in it, the citizens who come before the court for three or four minutes must be completely bewildered. Many must believe that they are being incarcerated for terrible deeds.'. [Fns. omitted.]" (Morris, *Conservatorship for Gravely Disabled, supra,* 15 San Diego L.Rev. 232.)

[18]The holding in this case shall be applied only to cases not yet final as of the date on which this decision becomes final. In light of Welfare and Institutions Code sections 5361 and 5364, this court is satisfied that final judgments establishing conservatorships over gravely disabled persons need not be disturbed, since the new rules announced in this case will, at any rate, shortly be available to all conservatees.

**CLARK, J.,** Concurring and Dissenting.—The thesis of the majority opinion appears to be that because the state has failed in caring for persons suffering mental disabilities, only persons with the gravest disabilities—those who by unanimous opinion beyond any reasonable doubt are gravely disabled—should be exposed to the degradations of adjudication as mentally ill. If what the majority say of the chamber-of-horrors atmosphere at our mental institutions (none of which appears in the record of this case) is true, does it follow that only those needing the greatest help should be subjected to such a defective program?

The majority opinion is the misguided result of gratuitously applying concepts developed in adjudicating criminal misconduct to the totally different procedure for adjudicating mental disability. The majority see the issues to be essentially the same, and thus require the same standard of proof—beyond reasonable doubt—by an unanimous jury. But the issues are different in at least one essential ingredient. A criminal's removal from the general environment is deemed a punishment and also serves to protect the general public. The removal is not for the purpose of affording direct benefits to the defendant, although it is hoped that some rehabilitative purpose will be served. On the other hand, a mentally disabled person is not removed for punitive reasons. The primary purpose for such removal is to benefit and protect that person.

Today's majority decision will make it more difficult to take action when the need for action is indicated. Who benefits from this added difficulty? Certainly not the mentally disabled person in need of professional intervention but too disabled to appreciate his or her need.

It further appears on legal analysis based on statutory considerations and applicable case law, that both the beyond-a-reasonable doubt and unanimity concepts should be rejected. I consider first the legal standard of proof.

The Act does not specify a standard of proof.[1] However, it does incorporate by reference Probate Code conservatorship provisions. (§ 5350.) Although Probate Code provisions state that civil trial procedures are applicable, the provisions do not specify a particular standard of proof. Evidence Code section 115 states the general burden of proof rule, providing in relevant part: *"Except as otherwise provided by law,* the burden of proof requires proof by a preponderance of the evidence." (Italics added.) The burden of proof "otherwise provided by law"

---

[1] All references herein to the Act are to the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5350 et seq.) and unless otherwise specified all other statutory references are to the designated sections of the Welfare and Institutions Code.

includes decisional law. (Evid. Code, § 160; *People* v. *Burnick* (1975) 14 Cal.3d 306, 313-314 [121 Cal.Rptr. 488, 535 P.2d 352].) Under these circumstances, it is incumbent upon this court to determine the appropriate burden of proof in light of the policies underlying the substantive law. (*People* v. *Burnick, supra,* at p. 314, fn. 5.)

The three traditional standards of proof, (1) evidence beyond a reasonable doubt, (2) clear and convincing evidence, and (3) preponderating evidence, represent "an attempt to instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." (*In re Winship* (1970) 397 U.S. 358, 370 [25 L.Ed.2d 368, 379, 90 S.Ct. 1068] (Harlan, J., concurring).) As the seriousness of the consequences resulting from an erroneous judgment increase, a stricter standard is required to mitigate against the possibility of error. (*People* v. *Burnick, supra,* 14 Cal.3d 306, 310.) In the context of the present case, the applicable standard should be determined in light of the nature and purpose of the proceedings, the potential deprivation of liberty, and the stigma incurred. (*Id.,* at pp. 315, 319, 321.)

Whether a proceeding is denominated civil or criminal, its nature and purpose must be ascertained by examining its true character. (*In re Winship, supra,* 397 U.S. 358, 365-366 [25 L.Ed.2d 368, 375-377]; *In re Gault* (1967) 387 U.S. 1, 49-50 [18 L.Ed.2d 527, 558-559, 87 S.Ct. 1428]; *Specht* v. *Patterson* (1967) 386 U.S. 605, 608-609 [18 L.Ed.2d 326, 329-330, 87 S.Ct. 1209].)

Grave disability is unrelated to criminal conduct. The proceedings are neither initiated by nor connected with criminal conviction. (Cf. *Specht* v. *Patterson, supra,* 386 U.S. 605; *People* v. *Burnick, supra,* 14 Cal.3d 306.) The Act seeks simply to provide care for those unable to satisfy their personal needs for food, clothing, and shelter. (§§ 5008, subd. (h), 5350, 5352.) The state's purpose is solely one of remedial treatment (*People* v. *Valdez* (1968) 260 Cal.App.2d 895, 904 [67 Cal.Rptr. 583]); it seeks neither retribution nor protection of society—the government's primary interests in criminal prosecutions. (*Specht* v. *Patterson, supra,* 386 U.S. at pp. 608-609 [18 L.Ed.2d at pp. 329-330]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 361-373 [121 Cal.Rptr. 509, 535 P.2d 373].) The Act serves to protect the person from the consequence of his own infirmity rather than to protect society from the person. When and if the conservatee is

confined, confinement occurs either in the private residence of a relative or in the hospital nearest the conservatee's home. Accordingly, it must be concluded the purpose of proceedings pursuant to the Act are remedial only, containing no element of either criminal or civil liability. (See *In re Gary W.* (1971) 5 Cal.3d 296, 302-303 [96 Cal.Rptr. 1, 486 P.2d 1201].)

We are not unmindful of the potential deprivation of liberty for a gravely disabled conservatee. Such person may be confined in a hospital for up to one year. (§ 5361.) However, potential confinement is controlled by extensive statutory safeguards. Confinement does not necessarily follow establishment of the conservatorship. (§ 5358.) If it occurs at all, confinement is never in a jail, prison, or an institutional environment designed for the punishment of persons convicted of crimes. (§ 5358.)[2] Further, the conservatee is entitled to two hearings during the one-year period in addition to initial judicial determination. (§ 5364.) The conservatee may also be released within one year if the conservator gives requisite notice. (§ 6000.) At the end of one year, the conservatee has a right to immediate release. (§ 5361.)

Some degree of stigma may attach to a person judicially determined to have been gravely disabled. However, the stigma is different both in degree and kind from that following criminal conviction or involuntary commitment as a mentally disordered sex offender. Criminal convictions carry society's approbrium based on fear and distrust. A gravely disabled person is far more likely to be viewed by society with compassion instead of fear. A prior criminal conviction may impose continuing legal impairment. The Act, on the other hand, prohibits even a presumption of incompetence. (§ 5368.)

The majority's reliance on *In re Winship, supra,* 397 U.S. 358 and *People* v. *Burnick, supra,* 14 Cal.3d 306, is misplaced. Unlike the situation presented in the instant case, those cases involved criminal proceedings. In both cases the consequence of an adverse decision subjected the individual to the possibility of confinement in a penal institution. The state's asserted interest was primarily the protection of society. Both cases concerned much greater deprivation of liberty than is here at issue. In *Burnick* the defendant was confined for an indeterminate period. In *Winship* the defendant was subject to potential confinement for six years.

---

[2]The majority appear to argue that because persons convicted of crimes who are determined to be mentally disordered are often confined in state hospitals—as may be a mentally disordered person not convicted of a crime—confinement in a state hospital is tantamount to confinement in prison. (*Ante,* p. 226.) The logic of such argument escapes me.

Further, the proceedings reviewed in *Winship* carried the greater stigma of a criminal conviction and in *Burnick* the additional burden of mentally disordered sex offender.

Balancing the benefit and purpose of the Act against adverse consequences to the individual clearly suggests the proper standard is clear and convincing proof. (See, *Woodby* v. *Immigration Service* (1966) 385 U.S. 276 [17 L.Ed.2d 362, 87 S.Ct. 483]; *Chaunt* v. *United States* (1960) 364 U.S. 350 [5 L.Ed.2d 120, 81 S.Ct. 147]; *Nishikawa* v. *Dulles* (1958) 356 U.S. 129 [2 L.Ed.2d 659, 78 S.Ct. 612].)

The less demanding standard of preponderating evidence would be improper. While this standard would allow full and efficient implementation of the statutory purpose, it would fail to adequately safeguard the individual's rights. The consequences of a determination of grave disability may result in confinement for one year. This potential deprivation of liberty dictates a higher standard of proof be used to minimize risk of error.

Conversely, requiring the stricter standard of proof beyond a reasonable doubt is inappropriate. While insulating the individual from the possibility of erroneous decision, this standard may also prevent individuals from receiving sorely needed aid. It must be remembered that while the consequences of an erroneous judgment finding a person gravely disabled are substantial, the consequences of an erroneous judgment finding a person not to be gravely disabled may well be more severe. In the latter case, an individual may quite literally be left to languish in the streets. Application of the criminal standard would threaten the beneficial statutory purpose while increasing the stigma.

The majority also err in concluding that grave disability can be found only by unanimous jury verdict. While the Act guarantees potential conservatees the right to a jury trial, it is silent as to whether the jury's verdict must be unanimous. (§ 5350, subd. (d).) As noted, however, the Act incorporates by reference Probate Code procedures for conservatorships. (§ 5350.) The Probate Code provides for factual determinations by a three-fourths majority when the factfinder is a jury. (Prob. Code, §§ 1702, 1230, 1233; see Prob. Code, § 1755.) Thus, the Legislature has provided for less than unanimous jury verdicts in grave disability cases. Accordingly, the issue is whether the Legislature's direction is constitutional.

While the Constitution mandates unanimous verdicts in criminal proceedings, it permits a three-fourths jury verdict in other cases. (Cal. Const., art. I, § 16; *People* v. *Feagley, supra,* 14 Cal.3d 338, 352; *People* v. *Superior Court (Thomas)* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623].) Grave disability proceedings under the Act being civil in nature, the legislative decision does not violate the basic constitutional provision concerning the right to a jury.

In contrast, the Act provides for unanimous jury verdicts in imminently dangerous proceedings. (§ 5303.) The majority appear to hold there to be a violation of equal protection clauses of the state and federal Constitutions in denying persons subject to grave disability proceedings the right to a unanimous jury verdict while granting such a right to persons subject to imminently dangerous proceedings.

The equal protection clauses (U. S. Const., Amend. XIV; Cal. Const., art. I, § 7, subd. (b)) require that persons similarly situated receive like treatment under the law. (E.g., *Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251]; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) Classifications must be reasonable in light of the purpose to be served. (E.g., *Rinaldi* v. *Yeager* (1966) 384 U.S. 305, 308-309 [16 L.Ed.2d 577, 579-580, 86 S.Ct. 1497]; *Brown* v. *Merlo, supra,* at p. 861; *Hayes* v. *Superior Court* (1971) 6 Cal.3d 216, 223 [98 Cal.Rptr. 449, 490 P.2d 1137].)

The verdict disparity between an imminent danger proceeding and a grave disability proceeding is justified because the persons subject to the different procedures are not similarly situated. Unlike a gravely disabled person, an imminently dangerous person poses a threat of harm to others. This danger gives rise to a governmental interest, analogous to the governmental interest in criminal proceedings. When the government's actions are motivated not only by benevolence towards the individual, but also by an interest in protecting others from the individual's behavior, potential for abuse exists. The proceedings may be misused as a substitute for criminal prosecution, justifying the additional safeguard of jury unanimity to protect the individual against the risk of error. (See *People* v. *Feagley, supra,* 14 Cal.3d 338, 361 et seq.) This additional governmental interest is reflected by the fact that commitment of those found to be imminently dangerous is mandatory. (§ 5304.) Because this interest is not

present in grave disability proceedings, imminently dangerous and gravely disabled persons are not similarly situated.[3]

The purpose of the Act's grave disability provisions is to provide prompt, short term treatment and care to those unable to feed, clothe, and shelter themselves. Obviously, the Legislature's classification in light of this purpose is reasonable.

The majority gratuitously conclude, based on materials not part of the record herein, that because of "the difficulty of defining mental illness, the factfinder's deference to psychiatric testimony, and the paternalistic attitude of some appointed counsel" (*ante,* p. 235), proof beyond a reasonable doubt and jury unanimity are "constitutionally mandated." There is no showing that any of the nebulous factors played any part in the instant factual determination that the conservatee is a gravely disabled person within the meaning of the act, yet these factors are now held to constitutionally mandate the majority's conclusions.

While the majority seek out reasons supporting the strictest test for determining grave disability—even straying far from the record to do so—they pay little or no heed to reasons for rejecting their conclusions. In determining the standard of proof and the jury requirement we are concerned with the possibility of error in judicial proceedings. In the event of such error there is the possibility that some persons not mentally ill may be confined, but there is also the risk that persons who—due to mental illness—are unable to take care of themselves will not receive care and treatment. The latter persons are faced with release without the ability to survive. Consideration of the right to freedom by persons who

---

[3]The majority improperly rely on *People* v. *Feagley, supra,* 14 Cal.3d 338, 356 (*ante,* pp. 229-233) for the theory that because a fundamental interest is involved—the right to a unanimous jury verdict—the state must demonstrate a "compelling interest" justifying the distinction between grave disability and imminent danger proceedings. The majority err first in assuming the very thing at issue. They state that this "court has previously characterized the right to a unanimous jury verdict as 'fundamental,' " citing *Feagley.* (*Ante,* pp. 231-232.) The issue, of course, is whether the right to a jury verdict in grave disability proceedings is "fundamental." *Feagley* dealt with mentally disordered sex offender proceedings. (Welf. & Inst. Code, § 6300 et seq.) Thus the proceedings in *Feagley* were of an entirely different character. The defendant there had been charged with and convicted of a criminal offense as a precondition to proceedings to determine his status as a mentally disordered sex offender. He was exposed in such proceedings to commitment in an institutional unit within a state prison—not a state hospital as in the instant case. This court noted in *Feagley* the more severe circumstances of confinement in such a unit when compared to confinement in a state hospital, contrary to the argument elsewhere urged by the majority in this case. (*People* v. *Feagley, supra,* 14 Cal.3d 338, 346-347.) The majority thus improperly rely on *Feagley* as they fail to demonstrate the same or similar fundamental right at issue here.

may be erroneously committed requires rejection of the standard of proof by a mere preponderance of the evidence; humanitarian considerations for persons who may be erroneously released require rejection of the criminal standard—proof beyond a reasonable doubt—and the unanimous verdict requirement. I am satisfied that such humanitarian considerations for the mentally ill require us to opt in favor of a clear and convincing proof test and the three-fourths jury verdict. The Legislature's decision to provide for less than an unanimous jury verdict to support a finding of grave disability is consistent with constitutional requirements.

I concur that the judgment must be reversed, but only for the reason that the jury was instructed to find on the question of grave disability by a preponderance of the evidence rather than by clear and convincing evidence. In all other respects I dissent from the majority opinion.

Richardson, J., and Manuel, J., concurred.

Respondent's petition for a rehearing was denied March 29, 1979, and the opinion was modified to read as printed above. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.