[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 677 
When appointed counsel in a conservatorship appeal fails to discover an arguable issue, must the Court of Appeal independently review the record upon a request per People v. Wende (1979) 25 Cal.3d 436?[1] Yes.
 I
A unanimous jury found Margaret L. gravely disabled, and the court extended her existing conservatorship.[2] We appointed an attorney to represent her on appeal, but counsel requested our independent Wende
review after failing to identify an arguable appellate issue.
The evidence at trial came from forensic psychologist Stephen Wells and Margaret L. testifying on her own behalf in opposition to the continuation of her conservatorship. Wells, who has been Orange County's Chief of Mental *Page 678 
Health Consultation for 19 years, personally examined Margaret L. on five occasions, beginning in 1993, but primarily in 1996 when her current conservatorship commenced. He also saw her about a week before trial at Beverly Manor, a locked-down, long-term psychiatric rehabilitation facility. In addition, he reviewed her extensive medical records and consulted with her treating physician and others involved in her care, including a deputy public guardian.
Although Margaret L., age 46, is a college graduate in accounting, she has had approximately 20 psychiatric hospitalizations. In Wells's opinion she suffers from "schizoaffective disorder." He described the condition as "a combination of schizophrenic-type symptoms and symptoms like mania and depression." Her symptoms include paranoid delusions and auditory hallucinations.
The present conservatorship began when police found Margaret L. wandering in traffic in a delusional state. Wells described her condition after hospitalization at that time: "She told various professionals, including myself, that her father and brother had been involved in the Watergate scandal. She also had the delusional belief that she was Peggy Sue and was being raped because of that. She claimed that John Fitzgerald Kennedy was her attorney. She said she had been involved in the Manson trial. She claimed that her family had forced her to be a child prostitute for the Kennedys. And again, she made additional charges of being molested and raped in a facility. [¶] This is one of the saddest and most difficult of the paranoid delusions. Ms. L[.] repeatedly believes that she's being raped, that has continued through the years. In every facility that she's been at she's reported people coming into her room to [rape her] at night."
In more recent years, Margaret L. believed that she had cured herself of AIDS by smoking cigarettes and drinking her own urine, her deputy public guardian was having an affair with one of her former husbands, her former employer was the CIA and it wanted to obtain her medical records, President Clinton wanted to harm her, her adoption of a female Japanese child was being frustrated by someone, and she had been raped by 18 Mafia dons. She also (incorrectly) believed she had an identical twin — who was harassing her conservator — and that her friends had abandoned her because they thought she murdered children and was the Antichrist. In addition, she was receiving telepathic communications from her parents who had not been otherwise in touch with her for years. The Mafia, she thought, intended to kill her family. Wells opined that Margaret L. is gravely disabled and cannot provide for her own clothing, food, and shelter, and that she would not take her numerous medications if she were set free. *Page 679 
In her testimony Margaret L. admitted she has had a mental illness for some 25 years, and she described it in terms similar to those employed by Wells. She stated she was taking five different medications and would continue to do so if released. She wished to go to Fredericksburg, Virginia where her older brother lives: "I think he would be able to take care of me." She denied having delusions, but stated it was true that the Mafia was going to kill her family. Margaret L. stated that she can cook, shop for groceries, clean house and wash her clothes.
 II
In Conservatorship of Besoyan (1986) 181 Cal.App.3d 34, 38, the court held, "Wende review is applicable where appointed appellate counsel has filed a brief on behalf of an LPS conservatee which raises no specific issues or describes the appeal as frivolous."[3] The court based its rationale on two lines of authority.
The first was headed by Conservatorship of Roulet (1979) 23 Cal.3d 219,224: "In effect, these statutes assure in many cases an unbroken and indefinite period of state-sanctioned confinement. `The theoretical maximum period of detention is life as successive petitions may be filed. . . .' (In re Gary W. (1971) 5 Cal.3d 296, 300, italics added.)"Roulet predated Wende and involved a different issue, whether civil or criminal procedures should be applied in the trial of conservatorships. Notwithstanding the Probate Code's adoption of civil rules (Prob. Code, § 1000), the court held the potential loss of freedom required that the finding of grave disability be made on a reasonable doubt standard by a unanimous jury.[4] For reasons explained below, that part of the Besoyan foundation appears to be intact.
Besoyan's other rationale was that ". . . Wende review has been held applicable to certain civil proceedings dealing with the parent/child relationship, due to the fundamental nature of the rights involved. . . ." There is no doubt that this analogous basis for the Besoyan holding has been eliminated. Our determination that Wende review was required in termination of parental rights cases based on an exhaustive examination of the law on the subject nationwide in In re Andrew B. (1995)40 Cal.App.4th 825 *Page 680 
was rejected by the Supreme Court in In re Sade C.,supra, 13 Cal.4th 952.[5]
Although Sade C. recognized the existence of Besoyan in footnote 2, page 962 (as well as Justice Mosk's supportive concurring and dissenting opinion in Conservatorship of Susan T., supra, 8 Cal.4th 1005,1022-1023), it did not directly disapprove of Besoyan. (After all, the issue of Wende review of conservatorship appeals was not specifically involved in the case.) Footnote 21 in Sade C. arguably does that, though. It states in part, "Insofar as any decision of ours or of the Courts of Appeal expressly or impliedly extends Anders beyond what is described in the text, it is disapproved." (In re Sade C., supra,13 Cal.4th at pp. 993-994, fn. 21; see also pp. 983-984, fn. 13.) This is the rule described in the text and repeatedly stated in Sade C.: ". . . Anders's `prophylactic' procedures have heretofore been limited in their applicability to appointed appellate counsel's representation of an indigent criminal defendant in his first appeal as of right. The United States Supreme Court established that limitation in Anders itself. It has reaffirmed it in its progeny." (Id. at p. 985; see Pennsylvania v.Finley (1987) 481 U.S. 551, 556.) Sade C. goes on to add this: "A fortiori, they [Wende/Anders] should not be applied . . . outside the sphere of criminal law." (In re Sade C., supra, at p. 985.)
Well, then, isn't that the end of the analysis? We do not believe so. Cases do not stand for questions not directly presented, or at least not directly answered, and Conservatorship of Roulet, supra, 23 Cal.3d 219 is still good law, as is Lassiter v. Department of Social Services (1981)452 U.S. 18, 26-27 ("presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty," italics added).
A reasonable reading of Roulet is that a conservatorship proceeding, at least one that potentially implicates the loss of personal freedom of the proposed conservatee (compare Prob. Code, § 1801, subd. (a) ["conservator of the person"] and subd. (b) ["conservator of the estate"]), is a criminal case for all practical purposes. Here is a pertinent part of the court's reasoning: "In criminal trials, proof of guilt beyond a reasonable doubt is an obstacle the state places in its own way, in order to lessen the possibility of convicting *Page 681 
an innocent person. This procedural constraint is eloquent testimony to the high stakes involved — a defendant's freedom and reputation hinge on the verdict. In People v. Burnick (1975) 14 Cal.3d 306, 319-322
[121 Cal.Rptr. 488, 535 P.2d 352], this court explicitly recognized that civil commitment to a mental hospital, despite its civil label, threatens a person's liberty and dignity on as massive a scale as that traditionally associated with criminal prosecutions. One has only to imagine the horror experienced by a competent person falsely committed as mentally disturbed in order to appreciate that freedom is openly on trial at a civil commitment proceeding. Therefore, the Burnick court ruled that proof beyond a reasonable doubt applies to mentally disordered sex offender proceedings. [¶] The logic of Burnick is equally applicable here. The appointment of a conservator for appellant and her subsequent confinement in a mental hospital against her will deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation." (Conservatorship of Roulet, supra, 23 Cal.3d at p. 223.)
Moreover, Roulet flatly holds that the label is of no consequence: "[R]espondent takes false comfort in the fact that appellant's commitment is only a `civil' confinement for remedial purposes. However, these are mere labels. Appellant's stay in Camarillo State Hospital was not any less involuntary because the state called her incarceration by one name rather than another. As the United States Supreme Court has authoritatively written, `commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil."' (In re Gault (1967) 387 U.S. 1, 50 [18 L.Ed.2d 527, 558,87 S.Ct. 1428].) In a subsequent opinion, the Supreme Court reiterated that `civil labels and good intentions do not themselves obviate the need for criminal due process safeguards. . . .' (In re Winship (1970) 397 U.S. 358,365-366 [25 L.Ed.2d 368, 376, 90 S.Ct. 1068].) [¶] This court has also rejected reliance on a civil label." (Conservatorship of Roulet,supra, 23 Cal.3d at p. 225.)
Finally, the court wisely refused to "be swayed by the fact that appellant had her liberty taken away, allegedly for her own good." (Ibid.) In the Roulet opinion, written at the height of the Cold War, the court may have been mindful of the practice of confining political dissidents in mental hospitals in the former Soviet Union: "`"Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action taken."' (Breed v. Jones (1975) 421 U.S. 519, 530, fn. 12 [44 L.Ed.2d 346, 356, 95 S.Ct. 1779].) The law must still strive to make certain that only those truly unable to take care of themselves are being assigned conservators under the LPS Act and committed to mental hospitals against their will." (Conservatorship of Roulet, supra, 23 Cal.3d at p. 225.)Wende review assists in achieving that goal. *Page 682 
Conservatorship of Susan T., supra, 8 Cal.4th 1005 does not support the contrary result our dissenting colleague advocates for several reasons. There the issue was whether to apply the exclusionary rule in conservatorships, and the court concluded that would be a poor idea. But the court did note that the exclusionary rule could be appropriately applied in some non-criminal contexts where the purposes are similar, such as forfeiture proceedings. (Id. at pp. 1014-1015.) And while the court stated that the purposes of the criminal law and conservatorship proceedings are entirely different (id. at p. 1015), it specifically cited and reaffirmed the holding of Roulet: "The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt and the verdict must be issued by a unanimous jury." (Id. at p. 1009.) Thus, accuracy of result is of great importance in conservatorships, while deterring unlawful searches and seizures is not. Wende review goes to the accuracy of the proceedings and costs little by any measure. Reading Sade C., Susan T., and Roulet
together, we must conclude Wende review is still required in conservatorships, at least those of the person.
Margaret L. was accused of no crime, but she faces severe stigma and even more disabilities than a convicted felon. Not only is her sentence potentially indeterminate, she has lost the power to manage her property (and she has some), have a professional license, drive, vote and even the right to refuse consent to certain medical treatment. (Conservatorship ofRoulet, supra, 23 Cal.3d at pp. 227-228.) We did not find it too burdensome under these circumstances to expend two or three hours to review this sparse record for arguable issues. Such cases, after all, terrorize us with the prospect of extra work about as often as newly discovered asteroids threaten to collide with Earth.
Finally, we reject our dissenting colleague's view that Wende review of conservatorships is not an important safeguard merely because of the rarity of the need for it or the small likelihood of discovering an arguable issue. The gravity of the stakes for conservatees greatly outweighs those considerations.
 III
We invited Margaret L. to file a brief on her own behalf, and she has not done so. Our review of the entire record discloses no reasonably arguable appellate issues. Substantial evidence supports the jury's findings and the trial court's order. Margaret L. was competently represented on this appeal. (See Conservatorship of Besoyan, supra,181 Cal.App.3d at p. 38.) *Page 683 
Judgment affirmed.
I Concur:
SILLS, P. J., concurs with separate opinion.
RYLAARSDAM, J., Concurs and dissents with separate opinion.
[1] Wende was the progeny of Anders v. California (1967) 386 U.S. 738, and Wende has recently been approved by the United States Supreme Court. (Smith v. Robbins (2000) 528 U.S. 259, 283-285 [145 L.Ed.2d 756,779].) While not identical approaches to the problem of monitoring indigent appeals where counsel fails to discover an arguable issue, the differences are not important here. Accordingly, for present purposesAnders and Wende may be referenced interchangeably.
[2] We abbreviate Margaret L.'s name to protect her privacy. (SeeConservatorship of Susan T. (1994) 8 Cal.4th 1005, 1008, fn. 1.)
[3] We solicited briefing on the continued vitality of Besoyan
in light of In re Sade C. (1996) 13 Cal.4th 952 and scheduled oral argument on our own motion.
[4] This court later ruled that a conservatorship could be terminated
by a vote of nine of twelve jurors. (Conservatorship of Rodney M. (1996)50 Cal.App.4th 1266, 1270-1272.)
[5] "Rejected" is probably too mild a term. The Sade C. opinion literally seethes concerning Andrew B. (See Sade C., fns. 11, 12, 13, 14, 18, 19, 21, 22.) The author of that opinion stands by the soundness of its research and conclusion but, of course, must follow Sade C. (AutoEquity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)