Filed 9/30/25 (unmodified opinion attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| Conservatorship of A.H. | |
| | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUTNY, as Conservator, etc., | A169588 |
| Plaintiff and Respondent, | (Contra Costa County Super. Ct. No. P2301672) |
| v. | |
| A.H., | **ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |
| Objector and Appellant. | |

**BY THE COURT:**

It is ordered that the opinion filed herein on September 8, 2025, be modified as follows:

1.  On page 48, the last sentence of the second full paragraph ("Moreover, LPS trials occur just one day a week.") is deleted.

2.  On page 49, the last sentence of the paragraph that begins on page 48 and ends on page 49 is deleted and replaced with the following:

    It is unclear whether these refer to petitions for an initial appointment of a conservator, or to petitions for reappointment that bear the same case number as the initial petition. In any event, the trial calendars do not persuade us that significant delays no longer plague LPS cases in Contra Costa County.

This order does not change the judgment.

1

The petition for rehearing filed on September 22, 2025 is denied.


CHOU, J.


WE CONCUR.

JACKSON, P. J.
BURNS, J.


*Public Guardian v. A.H.* (A169588)

A169588/ *Public Guardian of Contra Costa County v. A.H.*

Trial Court:        Superior Court of the County of Contra Costa

Trial Judge:       Frank Riebli

Counsel:           Rudolph Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas L. Geiger, County Counsel, Monica A. Mueller and Nina Florence Dong, Deputy County Counsel, for Petitioner and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of A.H. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUTNY, as Conservator, etc., | A169588 |
| Plaintiff and Respondent, | (Contra Costa County Super. Ct. No. P2301672) |
| v. | |
| A.H., | |
| Objector and Appellant. | |

Plaintiff and respondent Public Guardian of Contra Costa County (Public Guardian) filed a petition to conserve defendant and appellant A.H. under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5350 et seq.)[1] in February 2023. The trial court imposed a temporary conservatorship pursuant to section 5352.1. A.H. demanded a trial, and his temporary conservatorship was extended up to September 25, 2023. A.H.'s trial was to begin by May 20, 2023, pursuant to section 5350, subdivision (d)(2), but it was set for July 17 and did not begin until July 26—one day after A.H.'s counsel objected to further continuances. The court thereafter granted several more continuances, to which A.H.'s counsel objected, that

_____

[1] Except where otherwise indicated, all statutory references are to the Welfare and Institutions Code.

1

prolonged the trial. While the trial on this first LPS petition was pending and as the initial temporary conservatorship was expiring, the Public Guardian filed a second petition to conserve A.H. and obtained a new temporary conservatorship that extended A.H.'s involuntary confinement. Trial on the new petition was to begin in October 2023. A.H. opposed further continuances and requested dismissal of both petitions, to no avail. The court eventually dismissed the first petition at the Public Guardian's request, and trial on the second petition began on January 2, 2024, approximately ten weeks after the statutory deadline. On January 5, 2024—over 10 months after the filing of the dismissed petition that started A.H.'s confinement—the court found that A.H. was gravely disabled due to a mental disorder, ordered a one-year LPS conservatorship, and imposed various restrictions. Upon the expiration of that conservatorship, the Public Guardian did not seek to extend it.

Appealing from the conservatorship order, A.H. contends: (1) the trial court erred by not dismissing both petitions because a recent amendment to section 5350, subdivision (d)(2) requires dismissal if the matter is not timely brought to trial; (2) the court abused its discretion in repeatedly continuing the trial, resulting in prejudice; and (3) the delay in adjudicating the conservatorship petitions violated A.H.'s due process rights.

A.H.'s first two arguments are unavailing. As held by Division Two of this court in *Conservatorship of T.B.* (2024) 99 Cal.App.5th 1361 (*T.B.*), section 5350, subdivision (d)(2) empowers the trial court—but does not require that court—to dismiss a conservatorship petition when the trial has not started by the statutory deadline. Furthermore, even if the court abused its discretion in repeatedly continuing the trial and denying A.H.'s requests

2

to dismiss the petitions, the error was harmless because it did not affect the conservatorship order from which A.H. appeals.

A.H.'s third argument, however, turns not on statutory procedures but on the overall delay between the filing of the first LPS conservatorship petition (coinciding with the start of his involuntary confinement pursuant to temporary conservatorships) and the conclusion of his trial. Rather than starting within 10 *days* after his request as required by statute and then concluding apace to a grave disability finding, A.H.'s trial took 10 *months* to reach a grave disability finding—a delay that appears endemic to LPS cases in Contra Costa County. Under the circumstances of this case—including that A.H. had never before been found gravely disabled and that none of the delay was attributable to him—we conclude that A.H. was deprived of due process and reverse the order of conservatorship.

## I. <u>FACTS AND PROCEDURAL HISTORY</u>

" 'The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of a mental disorder, are dangerous or gravely disabled.' " (*T.B., supra*, 99 Cal.App.5th at pp. 1375–1376.) The Act promotes substantial public interests, including " ' "ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program." ' " (*T.B.*, at p. 1376.)

At the same time, there can " 'be no doubt "[t]he liberty interests at stake in [an LPS] conservatorship proceeding are significant. A person found to be gravely disabled may be involuntarily confined for up to one year, and

3

the conservatorship may be extended for additional one-year periods, so long as the person remains gravely disabled." [Citation.] In addition to such confinement, a conservatorship may result in the loss of other personal rights, including driving privileges, contracting and voting rights, and the right to refuse or consent to medical treatment. [Citation.] A person also has a reputational interest in not being improperly or unfairly stigmatized.' " (*T.B.*, *supra*, 99 Cal.App.5th at p. 1376.)

" '[B]ecause the private interests implicated in an LPS conservatorship are significant, "several layers of important safeguards" have been built into the system [citation] to "vigilantly guard[ ] against erroneous conclusions" in such proceedings [citation]. For starters, the LPS Act provides for a "carefully calibrated series of temporary detentions for evaluation and treatment" before a person may be found to be gravely disabled and subject to a year-long commitment.' " (*T.B., supra*, 99 Cal.App.5th at p. 1376.)

Upon filing a petition for a one-year conservatorship, the Public Guardian may obtain a court order for a temporary conservatorship pending resolution of the petition. (§ 5352.1, subd. (a).) Subject to some exceptions, a temporary conservatorship expires "automatically after 30 days" unless the trial court conducts a hearing before then on the issue of whether the proposed conservatee is gravely disabled. (§ 5352.1, subd. (c).) "If the proposed conservatee demands a court or jury trial on the issue of whether they are gravely disabled, the court may extend the temporary conservatorship until the date of the disposition of the issue by the court or jury trial, provided that the extension does not exceed 180 days." (§ 5352.1, subd. (d).)

Once the proposed conservatee demands a trial, the trial "shall commence within 10 days of the date of the demand, except that the court

4

shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed conservatee." (§ 5350, subd. (d)(2).)

With this statutory framework in mind, we summarize the Public Guardian's efforts to conserve A.H.

A. February 2023 Petition

The Public Guardian filed a LPS petition for the appointment of a temporary conservator and a conservator of the person for A.H. (Case No. P23-00322) on February 28, 2023 (First Petition). The Petition, supported by a declaration from a mental health professional, alleged that A.H. was gravely disabled as a result of a mental disorder under section 5008, subdivision (h)(1)(A). The trial court issued an order appointing a temporary conservator for A.H. on that same date.

On May 10, 2023, A.H.'s counsel requested a court trial. Pursuant to section 5352.1, subdivision (d), the temporary conservatorship was extended up to 180 days. Pursuant to section 5350, subdivision (d)(2), the trial was to commence by May 20, 2023 (within 10 days after the demand), with up to a 15-day extension upon A.H.'s request. Trial, however, was set for July 17, 2023. Neither party objected.

On July 17, 2023, A.H.'s counsel claimed to be ready for trial but acknowledged that she was assigned to handle another LPS trial and no other deputy public defender was available for A.H.'s trial. The trial court was also engaged in another trial and no other courtroom was available. The court found good cause to continue A.H.'s trial to July 24. A.H. did not object.

On July 24, 2023, the trial court found good cause to continue the trial date for one day due to an ongoing jury trial in the courtroom. In addition, both attorneys were unavailable. A.H.'s trial counsel, Deputy Public Defender Andrea Crider, stated that she was ready for trial but did not object

5

to the continuance. The court noted that the temporary conservatorship was expiring in September and recognized A.H.'s case "to be [a] priority."

B. Trial on the First Petition and A.H.'s Objections to Continuances

On July 25, 2023, Contra Costa County counsel (County Counsel), who represented the Public Guardian, requested a continuance because both sides were involved in another LPS trial. Crider objected to the continuance and requested a dismissal. The trial court found good cause for the continuance due to court unavailability. Because the trial pending in that courtroom was likely to finish that day, it continued A.H.'s matter to the next day.

On July 26, 2023, A.H. personally waived his right to a jury trial and his court trial began. The trial court ruled on the admissibility of some of the medical records that the Public Guardian wanted in evidence. However, the court was not available for LPS matters for the rest of the day or the following week. The next available date for trial was therefore August 7, but the conservator was unavailable and the court entertained LPS cases only three days of the week. Over Crider's objection, the court continued the trial to August 14.

On August 14, 2023, County Counsel was unable to appear because she was engaged in another jury trial. Crider objected to a continuance. Aware that the temporary conservatorship was expiring on September 25, the trial court found good cause to continue the trial to September 19, because both counsel were engaged in other cases and because the Public Guardian's conservators were attending a training session for most of the week of September 11.

On September 19, 2023, the trial court continued the trial to September 25, noting that both counsel and the court were engaged in another trial. Crider objected to the continuance.

6

The matter reconvened on September 25, 2023, which was (according to the Public Guardian) the date the temporary conservatorship expired.[2] The matter was continued to the afternoon and then to the next day.

On September 26, 2023, Crider informed the trial court that the temporary conservatorship had expired. She moved to dismiss the First Petition due to the delays and prejudice to A.H., who had been detained for approximately seven months without completing his trial. The Public Guardian countered that the First Petition, which sought a permanent (one year) conservatorship, remained at issue despite the end of the temporary conservatorship. The court declined to rule without briefing from the parties. The court intended to proceed with the trial on the First Petition in the meantime, but Crider asked that the matter be continued to the afternoon so she could refresh her recollection of the evidence. The court expressed concern that there might not be a court reporter available but continued the matter to the afternoon. The court stated: "I agree, this needs to be a priority because—well, actually, we haven't taken any testimony so it's not as bad as a situation like that. We're just still on record review so that's okay, but I agree."

---

[2] A temporary conservatorship generally expires "automatically after 30 days" but if the conservatee demands a trial, the trial court may extend the temporary conservatorship for up to 180 days. (§ 5352.1, subd. (d).) Here, 30 days after the imposition of the temporary conservatorship on February 28, 2023, was March 30, 2023. Due to A.H.'s trial demand, the temporary conservatorship could be extended up to 180 days, which would be September 26. A.H., however, claims that the temporary conservatorship expired in August. But that claim appears to stem from a misperception that the temporary conservatorship can be extended so that it *lasts* up to 180 days (including the initial 30 days), while the statute states it can be extended 180 days *from* the end of the initial 30-day period.

Trial on the First Petition reconvened in the afternoon of September 26, 2023. The Public Guardian announced that it had filed a new petition to conserve A.H. (Second Petition) and the trial court had issued a new temporary conservatorship. A.H.'s counsel advised that she was filing a Code of Civil Procedure section 170.6 challenge to the judge (Judge Athanasiou) on the Second Petition.[3] Judge Athanasiou resumed the trial on the First Petition, reserving his ruling on the issue of grave disability until receipt of the parties' briefs on whether the court had jurisdiction notwithstanding the termination of the temporary conservatorship. Specifically, the court ruled on the admissibility of certain medical records, and County Counsel made an opening statement and called her first witness. At the end of the day, the court intended to continue the trial to the next day but A.H.'s counsel was unavailable due to other trial commitments so the court continued the trial to October 2, at A.H.'s counsel's request.

C. <u>September 2023 Petition</u>

The Second Petition (case No. P23-01672), dated September 25, 2023 but filed on September 28, alleged that A.H. was gravely disabled as a result of a mental disorder. A mental health professional's declaration supported the Petition. The trial court appointed a temporary conservator in a written order that the court signed on September 25 but filed on September 28.

D. <u>Litigation on Both Petitions</u>

On October 2, 2023, over A.H.'s objection, the trial court found good cause to continue the trial on the First Petition to October 9.

On October 9, 2023, the trial court continued the trial on the First Petition for one day, over A.H.'s objection, because both parties' counsel were

---

[3] The minutes of the hearing indicate that Judge Athanasiou accepted the Code of Civil Procedure section 170.6 challenge as to the new petition.

involved in another jury trial. Also on that day, A.H. filed a motion for release and dismissal of the First Petition because trial had not begun by the statutory deadline and the temporary conservatorship had expired.

On October 10, 2023, the trial court continued the trial on the First Petition to the following day because Crider was ill and because the Public Guardian's expert witness was unexpectedly unavailable.

The First Petition trial resumed on October 11, 2023, before Judge Athanasiou. County Counsel confirmed that her witness would be out ill for several days. Over Crider's objection, the trial court found good cause to continue the trial to October 16, due to the unavailability of that witness. Crider noted her previous request for dismissal of the First Petition due to delays and the expiration of the temporary conservatorship in that proceeding, as well as her objection to the temporary conservatorship in the Second Petition. County Counsel responded that petitions for temporary conservatorships are not automatically granted; rather, they require a new evaluation and declaration from a doctor and review by a judge. The court noted the objection and response.

Also on October 11, 2023, the trial court (Judge Fenstermacher) held a separate hearing on the Second Petition. A.H. moved orally to dismiss the Second Petition (or at least the temporary conservatorship in that proceeding) due to the expiration of the temporary conservatorship in the ongoing First Petition. The Public Guardian moved to consolidate the two petitions. The court declined to do so, choosing instead to see what would happen on the First Petition. A.H. requested a jury trial on the Second Petition on a time-not-waived basis. The court set the jury trial on the Second Petition for October 16.

9

On October 16, 2023, the Second Petition was called for trial before a different judge. The trial court did "not have an available department to assign [the] matter" that day. The Public Guardian moved to consolidate the two petitions. Crider reiterated her request for a jury trial on the Second Petition on a time-not-waived basis, objected to the temporary conservatorship, and requested a dismissal of the Second Petition because it followed a temporary conservatorship that was terminated after more than 180 days. The court did not grant either motion. Instead, it continued the proceedings on the Second Petition to October 23, to see what would happen on the First Petition.

On October 17, 2023, trial on the First Petition resumed, having been continued from October 16 when the trial court was "unexpectedly unavailable." A.H. again moved to dismiss the First Petition due to the expiration of the temporary conservatorship. The court recited the history of the trial settings and continuances on the record and denied A.H.'s motion to dismiss. Testimony of the Public Guardian's first witness continued.

On October 18, 2023, trial on the First Petition resumed until 11:30 a.m., when Crider had to appear in a different department. The trial court continued the trial to October 30.

E. Motion to Dismiss the Second Petition

On October 19, 2023, A.H. filed a written motion for release and dismissal of the Second Petition. A.H. argued that trial did not begin by the statutory deadline. A.H. also argued that the temporary conservatorship in the First Petition had expired so there was no basis for the temporary conservatorship in the Second Petition. Lastly, A.H. argued that he was prejudiced by the lengthy delay.

10

The trial court (Judge Fenstermacher) heard the motion for release and dismissal on October 23, 2023. Deputy Public Defender Stephanie Regular appeared on A.H.'s behalf. Regular argued that temporary conservatorships should be temporary and that the Public Guardian should not be allowed to establish a conservatorship lasting nearly a year by stacking temporary conservatorships. Regular noted that the maneuver was "becoming a custom and practice in this county," and the Public Guardian was "attempting to circumvent the statute [and her client's] due process rights, by filing successive temporary conservatorships." County Counsel countered that there was no statutory limit to seeking temporary conservatorships if they met the statutory requirements, including documentation from a professional that the conservatee was gravely disabled.

The trial court directed County Counsel to brief the issue and continued the hearing to November 2, 2023.[4] The Public Guardian filed its response to A.H.'s motion on October 31.

At the hearing on November 2, 2023, the trial court (Judge Fenstermacher) considered A.H.'s October 19 filing and the Public Guardian's October 31 filing. The court heard arguments about courtroom availability, whether the court retained jurisdiction over the First Petition after the temporary conservatorship expired, and whether a second temporary conservatorship could follow the expiration of the first one. In particular, Crider disputed the Public Guardian's claim that she had been unavailable for trial, except for one time when she was ill, when the Public Guardian's

___

[4] The Second Petition was heard again on October 30, 2023, by a different judge (Judge Frank Riebli). Both the trial court and counsel were otherwise engaged in another trial that day. Counsel advised the court of the November 2 hearing on the motion to dismiss the First Petition, and the matter was continued to that date.

11

witness was also unavailable.  Whenever she was assigned to another trial, she asked the court to assign A.H.'s trial to a different department so she could get another deputy public defender to cover it.  Crider complained about the Public Guardian's "double stacking" of temporary conservatorships and the piecemeal nature of the First Petition proceedings.  She recounted that she had sought but never obtained a hearing on the temporary conservatorship that was issued with the Second Petition.  Although, by the time of the hearing, she was the only deputy public defender covering LPS cases until January 2, 2024, she stressed that her unavailability should not be attributed to A.H.  Crider reiterated that the First Petition should have been dismissed and that A.H. should have been released upon the expiration of the temporary conservatorship in that matter.  For that reason and the delay and "piecemealness" of the trial, she was going to move for a mistrial on the First Petition.

The trial court ruled that the law did not prohibit a second temporary conservatorship even if it immediately followed an expired conservatorship. The court was therefore "not inclined to dismiss and release" on the Second Petition.  (Block capitalization omitted.)

F.  <u>Mistrial on the First Petition</u>

Trial resumed on the First Petition on November 13, 2023, before Judge Athanasiou.  Crider moved for a mistrial due to the delays and asked that a new trial be set or that the First Petition be dismissed.  The trial court declared a mistrial in the First Petition and set a new trial for the same date and department as the jury trial in the Second Petition.

G.  <u>Continuance of Second Petition Trial Beyond Deadline</u>

The matters were next heard on November 27, 2023, before Judge Riebli.  By this time, the 10-day deadline to commence trial on the Second

12

Petition had passed. The trial court stated that it was unable to begin a jury trial on the Second Petition "because the parties are otherwise engaged in a jury trial in the E.A. case."[5] Deputy Public Defender Christy Pierce, appearing on behalf of A.H., stated that she would be ready to appear for A.H.'s trial as soon as the E.A. case finished. County Counsel moved to continue the matter due to Crider's unavailability, another pending trial, and the fact that it was still awaiting records from A.H.'s current facility. A.H.'s counsel objected to the continuance and asked the court to send the matter to a different department. The court wanted to "attempt to get this case out as soon as possible" but found good cause for the continuance and set the matter for court trial on December 11.[6]

### H. Dismissal of First Petition and Continuance of Second Petition

Both petitions were before the trial court on December 11, 2023. This time, the court (Judge Riebli) expressed the view that the First Petition should be dismissed because the temporary conservatorship had expired and because a new temporary conservatorship had been ordered in the Second Petition. The Public Guardian moved to dismiss the First Petition on those grounds. Crider, having moved to dismiss the case multiple times, emphasized the prejudice A.H. endured from the long delays and the stacked temporary conservatorships but objected to the dismissal of the First Petition to preserve A.H.'s rights on appeal. The court nonetheless dismissed the First Petition.

On that same day, the Public Guardian sought to continue the trial on the Second Petition due to trials in other LPS matters and witness

---

[5] See *E.A. v. E.A.* (Aug. 28, 2024, A169299) [nonpub. opn.] (*E.A.*), review granted Dec. 11, 2024, S287241, in *Conservatorship of E.A.* [nonpub. opn.].

[6] It is unclear from the record when A.H. agreed to a court trial rather than a jury trial.

13

unavailability. Crider objected and sought dismissal for failure to timely commence the trial. The trial court granted the continuance due to courtroom unavailability. After a break in the proceeding to deal with other cases, the court stated that it would treat A.H.'s case as if it had been filed in February 2023 (when the First Petition was filed) so it would have priority. The court continued the matter to December 18, 2023.

A.H. filed a second written motion for his release and dismissal of the Second Petition on December 12, 2023. A.H. argued that the current temporary conservatorship was unlawful because the first temporary conservatorship had expired. Furthermore, A.H. claimed that his due process rights were violated due to the failure to start the trial on the Second Petition within the deadline set forth in section 5350. He argued that, due to the "court's delays, [A.H.] has been conserved far longer than [A.H.] would have been had . . . the court complied with the statute." Crider averred in a declaration that A.H. had "suffered anxiety" due to the delays, that A.H. said he "feels like a 'victim,' " and that she saw A.H. "decompensate due to the continued pro-longed detention."

On December 18, 2023, both parties announced that they were ready for trial. However, both counsel were also in trial in a different LPS case, so the trial court continued the matter to January 2, 2024, over Crider's objection. The court denied A.H.'s December motion to dismiss the Second Petition, ruling that dismissal under section 5350, subdivision (d)(2), was directory rather than mandatory.

I. <u>Trial on the Second Petition</u>

A.H.'s trial on the Second Petition began on January 2, 2024, and concluded on January 5.[7] Shahbaz Khan, a psychiatrist and consultant with

_____

[7] Because A.H. does not challenge the finding of grave disability or

14

the Public Guardian, testified that he interviewed A.H. in person for roughly one hour, reviewed "a bunch of [his] medical records," including mental health records from Contra Costa Regional Medical Center, and had a brief discussion with one of the caretakers at A.H.'s facility. Based on this information, he diagnosed A.H. with chronic schizophrenia.

The trial court found that A.H. was gravely disabled and imposed a LPS conservatorship. The court decided that a secured mental health rehabilitation center was the least restrictive placement for A.H. At the request of the Public Guardian, the court also stripped A.H. of his rights to possess a license to operate a motor vehicle, to refuse or consent to psychiatric treatment and medication, and to custody or control of any firearm or other deadly weapon.

A.H.'s conservatorship lasted one year from January 5, 2024, to January 4, 2025. (§ 5361, subd. (a).) The Public Guardian did not seek to renew A.H.'s conservatorship.

A.H. timely filed a notice of appeal from the January 5, 2024 order of conservatorship.

## II. DISCUSSION

A.H. contends: (1) an amendment to section 5350, subdivision (d)(2), required the dismissal of both of his LPS petitions because he was not brought to trial within the statutory period; (2) the trial court abused its discretion by repeatedly granting continuances without good cause and failing to dismiss the petitions; and (3) the long delay in completing his trial, particularly from the filing of the First Petition to the completion of the trial on the Second Petition, violated his due process rights. As a threshold

---

contend that the trial court's error affected the presentation of evidence, we minimize our summary of the evidence at trial.

matter, we reject the Public Guardian's plea for us to dismiss A.H.'s appeal as moot. We then find that A.H.'s first two contentions do not support reversal but the third one does.

A. Mootness

A court of appeal need not address the merits of an appeal if the issues have become moot due to events occurring during the appeal. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.) The Public Guardian argues that this has occurred here because, after A.H. filed his appeal, the trial court granted the Public Guardian's motion to terminate the conservatorship and dismissed the proceedings.[8] The Public Guardian asks that we therefore dismiss A.H.'s appeal as moot.

We decline. Even if an appeal is moot, this court may decide the appeal on the merits if the controversy between the parties is likely to recur. (*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 144; see *Conservatorship of Forsythe* (1987) 192 Cal.App.3d 1406, 1409.) We may also decide a moot appeal if it is a matter of general public interest or importance. (*Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1240, fn. 1.) Both grounds apply here.

The Public Guardian urges us not to take on the issues in this case because A.H.'s challenges to the trial court's rulings are "based on the specific and unique procedural history of this case," which is not likely to recur. To

_____

[8] The Public Guardian filed a Request for Judicial Notice and Motion to Dismiss Appeal as Moot on January 16, 2025. The exhibits to that motion include: (1) the Public Guardian's January 2025 motion to terminate the conservatorship after its expiration on the ground that A.H. was no longer gravely disabled; and (2) the trial court's order granting that motion. We deferred ruling on the request for judicial notice pending consideration of the merits and now grant it.

the contrary, the issues raised by A.H. have recurred for some time and appear almost certain to recur in the future.  Indeed, those issues have plagued LPS cases in Contra Costa County for years, which is A.H.'s very point.  In fact, *T.B.*—the primary case on which both parties rely—arose out of Contra Costa County and involved nearly identical issues arising in 2022–2023.  (*T.B. supra*, 99 Cal.App.5th at pp. 1370–1373.)  Other cases from Contra Costa County reflect similar delays.  (See, e.g., *Conservatorship of J.Y.* (2020) 49 Cal.App.5th 220, 224 [noting that the petition was filed in November 2018 and the trial occurred in April 2019].)[9]  We therefore proceed to the merits.  (See *Conservatorship of Jones* (1989) 208 Cal.App.3d 292, 298 ["the collateral consequences remaining after the termination of a conservatorship (such as legal questions arising from the period of incapacity and potential social stigma) justify [appellate] review"].)

B.  Failure to Dismiss After Expiration of the Statutory Trial Deadline

Section 5350, subdivision (d)(2) reads in part:  "The court or jury trial shall commence within 10 days of the date of the demand [for a trial], except that the [trial] court shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed conservatee."  Before the amendment to this subdivision in 2022, courts had determined that the deadline was directory, not mandatory, and therefore dismissal of the petition was not required if the deadline passed.  (*Conservatorship of James M.* (1994) 30 Cal.App.4th 293, 298–299 (*James M.*); *Conservatorship of Jose B.* (2020) 50 Cal.App.5th 963, 972–974 (*Jose B.*); *Conservatorship of M.M.* (2019) 39 Cal.App.5th 496, 500 (*M.M.*).)  Part of the reasoning for this

---

[9] Unpublished opinions dealing with similar issues in Contra Costa County include *E.A., supra*, A169299—in which our Supreme Court has granted review.

17

conclusion was that section 5350 set forth no remedy for the failure to meet the statutory deadline. (*James M.,* at p. 298.)

Effective January 2023, the Legislature added the following language to section 5350, subdivision (d)(2): "Failure to commence the trial within [the 10 or 15-day period] is grounds for dismissal of the conservatorship proceedings." (Stats. 2022, ch. 960, § 5.) Despite this amendment, Division Two of this court maintained that the deadline was still directory in *T.B., supra,* 99 Cal.App.5th 1361. Based on the language of section 5350, subdivision (d)(2), its legislative history, and the consequences of the proposed interpretations of the statute, *T.B.* held that the amendment was intended "to clarify and bring the statute into conformity with the prior judicial interpretation" that dismissal was permissible but not required. (*T.B.,* at p. 1382.)

A.H. contends that *T.B.* is incorrect. He argues that case law before the amendment found that the LPS trial timing statutes were directory rather than mandatory, so the Legislature must have intended to change that when it amended the statute. But as *T.B.* observed, the language that the Legislature chose shows otherwise. Describing an event as " 'grounds for dismissal' " does not mean that the event automatically results in dismissal. (*T.B., supra,* 99 Cal.App.5th at p. 1383.) To the contrary, the Legislature knows how to word a statute when it intends to mandate a dismissal. (See, e.g., Pen. Code, § 1382, subd. (a) ["The court, unless good cause to the contrary is shown, shall order the action to be dismissed"]; Welf. & Inst. Code, § 5352.1, subd. (c) ["Except as provided in this section, a temporary conservatorship shall expire automatically after 30 days"].) Thus, the 2023 amendment to section 5350, subdivision (d)(2), merely clarifies that the trial

court has discretion to dismiss the proceeding but is not obligated to do so. A.H. therefore fails to demonstrate error.[10]

That said, trial courts should not consider the discretionary nature of dismissal as a license to start an LPS trial whenever they get around to it. The amendment underscores the Legislature's intent that an LPS trial commence *within 10 days after the request for trial*. The only exception set forth in the statute is a 15-day extension when sought *by the proposed conservatee*. Expressly authorizing the court to dismiss the petition if trial does not begin by the deadline only emphasizes the deadline's importance.

Indeed, the legislative history of the amendment to section 5350, subdivision (d)(2), bears this out. The legislative analysis of the bill noted that its purpose was to improve access to due process. (E.g., Legis. Counsel's Dig., Assem. Bill No. 2275 (2021–2022 Reg. Sess.) Aug. 25, 2022, p.2.) Likewise, the Assembly Committee on the Judiciary identified the dismissal provision and recognized that the bill would result in "critical due process protections." (Assem. Com. on Jud., Rep. on Assem. Bill No. 2275 (2021–2022 Reg. Sess.) April 19, 2022, pp. 2–3.) In short, the Legislature remains serious about the 10-day (or 25-day) deadline, and the courts must be too. (See *Jose B., supra*, 50 Cal.App.5th at p. 967 ["deeply troubled" by the four-month delay in commencing a LPS trial, "we emphasize the statutory obligation of trial courts to hold a jury trial within 10 days, with only a limited exception for a 15-day continuance if requested by the proposed conservatee"].)

---

[10] As to the First Petition, A.H., through counsel, did not object to the initial trial date that was set beyond the statutory deadline. Arguably, he thereby forfeited his right to obtain dismissal of the First Petition for failure to commence the trial on time. We need not decide this issue.

19

C.  Exercise of Discretion in Continuing the Trial

A.H. next contends that, even if dismissal is not mandatory, "the trial court abused its discretion . . . by repeatedly granting continuances without recognizing the lack of good cause to do so."  He also argues that the court did not consider all relevant factors in granting those continuances.  Reviewing the court's rulings for abuse of discretion (*T.B., supra,* 99 Cal.App.5th at p. 1388), we conclude that A.H. has not demonstrated prejudicial error under this theory.

1.  Procedure

LPS cases are generally governed by the rules of civil procedure.  (See Welf. & Inst. Code, § 5350 [with exceptions, "[t]he procedure for establishing, administering, and terminating a conservatorship under this chapter shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code"]; Prob. Code, § 1827 ["The court shall hear and determine the matter of the establishment of the conservatorship according to the law and procedure relating to the trial of civil actions, including trial by jury if demanded by the proposed conservatee"].)

Motions to continue a trial date are thus governed by rule 3.1332 of the California Rules of Court (Rule).  Rule 3.1332(a) warns that "the dates assigned for a trial are firm" and that "[a]ll parties and their counsel must regard the date set for trial as certain."  Any request for a continuance of the trial date—even if stipulated—must be made by a written motion or ex parte application with supporting declarations.  (Rule 3.1332(b).)  Rule 3.1332(c) states that "continuances of trials are disfavored" and "[t]he [trial] court may grant a continuance only on an affirmative showing of good cause requiring the continuance."  "Circumstances that may indicate good cause include: [¶] (1) The unavailability of an essential lay or expert witness because of death,

illness, or other excusable circumstances; [¶] (2) [t]he unavailability of a party because of death, illness, or other excusable circumstances; [and] [¶] (3) [t]he unavailability of trial counsel because of death, illness, or other excusable circumstances." (Rule 3.1332(c).)

In ruling on the motion, however, "the [trial] court must consider all the facts and circumstances that are relevant to the determination." (Rule 3.1332(d).) These facts and circumstances "may include: (1) The proximity of the trial date; [¶] (2) Whether there was *any previous continuance, extension of time, or delay of trial* due to any party; [¶] (3) The length of the continuance requested; [¶] (4) *The availability of alternative means to address the problem* that gave rise to the motion or application for a continuance; [¶] (5) The *prejudice* that parties or witnesses will suffer as a result of the continuance; [¶] (6) . . . the reasons for [a preferential trial setting] and whether the need for a continuance outweighs the need to avoid delay; [¶] (7) The *court's calendar* and the impact of granting a continuance on other pending trials; [¶] (8) Whether *trial counsel is engaged in another trial*; [¶] (9) Whether all parties have *stipulated* to a continuance; [¶] (10) Whether the *interests of justice* are best served by a continuance, by the trial of the matter, or by imposing conditions on the continuance; and [¶] (11) Any other fact or circumstance relevant to the fair determination of the motion or application." (Rule 3.1332(d), italics added.)

### 2. Trial Court's Consideration of the Circumstances

A.H. first objected to a continuance on July 25, 2023. In ruling on the Public Guardian's requests for continuances from then on, the trial court did not weigh (on the record) all the applicable factors identified in rule 3.1332. Instead, the court simply specified the basis for the continuances, usually

invoking the unavailability of some combination of counsel, the court, or a key witness. (See Rules 3.1332(c); 1332(d)(7) & (8).)

We need not, however, decide whether the trial court abused its discretion by failing to indicate on the record that it considered all relevant facts and circumstances. (Compare *People v. Benson* (2025) 110 Cal.App.5th 1068, 1081–1082 [order granting a continuance is presumed correct, and the appellant must demonstrate that the court did not properly weigh the relevant factors] with *T.B.*, *supra*, 96 Cal.App.5th at pp. 1391–1392 [where the record did not show that the court "considered all of the relevant facts and circumstances, including those just listed in rule 3.1332," and that the court "in general viewed T.B.'s trial date with the level of urgency it requires" but "focused exclusively on the calendar of the Public Guardian's attorney, as well as its own calendar," the court's "failure to carefully balance the relevant facts and competing interests at stake" constituted an abuse of discretion].) Instead, we conclude, as explained below, that the court abused its discretion by granting continuances without a sufficient showing of good cause.

### 3. Good Cause for the Continuances

The trial court may not continue a trial date without good cause. (Rule 3.1332(c).)[11] Good cause may include the unavailability of an "essential lay or expert witness," a party, or trial counsel "because of . . . illness, or other excusable circumstances." (*Ibid.*) Here, the court regularly cited the unavailability of trial counsel, the court, a courtroom, and/or the Public Guardian's expert witness as grounds for continuing A.H.'s trials.

---

[11] The parties do not note any distinction between postponing the trial *date* under Rule 3.1332(c)—such that the trial does not begin as originally scheduled—and continuing the proceedings after the trial began. We need not address this distinction to resolve the appeal.

Although continuing a trial due to the unavailability of court or counsel seems appropriate on its face, A.H. argues that the consistent and ongoing unavailability of attorneys and courtrooms in this case did not constitute good cause because it was not due to "*excusable* circumstances." (Rule 3.1332(c), italics added.) Rather than arising from an unexpected event, their unavailability was due to a system that administers LPS trials in a way that makes the unavailability of court and counsel likely, if not inevitable. As A.H. puts it, "[t]he conflict was caused because inadequate resources were devoted to LPS cases in Contra Costa County." The record supports this conclusion.

Unlike delays caused by unforeseen circumstances, chronic courtroom unavailability due to systemic shortcomings of the state is not good cause for repeated continuances. (See *People v. Johnson* (1980) 26 Cal.3d 557, 570 [delay in commencing trial, if "caused by improper court administration," is not good cause to avoid dismissal of criminal charges under Penal Code section 1382]; *People v. Engram* (2010) 50 Cal.4th 1131, 1163 ["Past California decisions establish that when the unavailability of a judge or courtroom is fairly attributable to the fault or neglect of the state, such unavailability does not constitute good cause within the meaning of [Penal Code section] 1382"]; see *People v. Hajjaj* (2010) 50 Cal.4th 1184, 1203 ["it is the state's obligation to resolve the routine logistical difficulties it faces in bringing defendants to trial in a timely manner"].)

*Johnson, Engram* and *Hajjaj* were decided in the context of continuances of a trial start date beyond the statutory deadline for a speedy trial. Although the trial court in this case continued the start date of the trial on the Second Petition for weeks, A.H.'s complaints regarding the First Petition stem largely from delays in the trial *after* it began. But if systemic

courtroom congestion does not suffice to avoid a dismissal for violation of speedy trial rules, it should not justify repeated continuances of trial proceedings after the trial began.

Indeed, there must come a point when courtroom or counsel unavailability no longer constitutes good cause for continuing a trial. And that point has been reached here. Given the number of continuances, the fact that A.H.'s trial was not completed by the time the first temporary conservatorship expired, and the history of delays in LPS cases in Contra Costa County, we can only conclude that one or more of the continuances in A.H.'s case, when the Public Defender's office was truly ready and available for trial, was born purely of systemic deficiencies in the handling of LPS cases in Contra Costa County.[12] On that basis, we assume that at least some continuances were not supported by good cause.

### 4. Prejudice

Assuming that the trial court erred by granting at least some continuances without good cause (Rule 3.1332(c)), A.H. is not entitled to relief unless he can demonstrate prejudice (*People v. Samayoa* (1997) 15 Cal.4th 795, 840). A.H. contends that the improper continuances merit automatic reversal or, if not, they resulted in prejudicial delay. We conclude otherwise.

---

[12] In some instances, A.H.'s counsel said that she was ready for trial even though she was in fact unavailable because she had a conflicting obligation in another case. In other instances, A.H.'s counsel represented that, despite her involvement in another trial, another public defender would be able to proceed with A.H.'s trial. Our conclusion that good cause was lacking is limited to situations where the Public Defender's Office was *truly ready and available* to proceed with A.H.'s trial. We do not express an opinion as to the other situations. Nor would we condone any gamesmanship by either counsel claiming to be ready for trial when there is no attorney available to represent their client at the trial.

24

### a. No Automatic Reversal

A.H. contends that the failure to provide him with a timely trial constituted a miscarriage of justice that compels reversal under article VI, section 13 of the California Constitution because he was denied an orderly legal procedure. (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1132–1134 (*Blackburn*) [failure to obtain valid jury trial waiver is tantamount to the denial of a jury trial and is therefore a denial of an "orderly legal procedure" that requires automatic reversal].) He urges that "the repeated erroneous findings of good cause, combined with the long delay, and the importance of a timely trial, means that this Court should not conduct a harmless error analysis . . . [but] simply rule in [his] favor."

We disagree. Improper continuances in violation of Rule 3.1332 do not compel reversal absent a showing of prejudice. (*T.B., supra,* 99 Cal.App.5th at pp. 1392–1393.) *Blackburn* did not involve repeated continuances of a trial but whether a trial court must advise the defendant personally of the right to a jury trial and whether the court must obtain a personal waiver of that right before holding a court trial to extend the defendant's commitment as a mentally disordered offender. (*Blackburn, supra,* 61 Cal.4th at p. 1116.) *Blackburn* is distinguishable, and A.H. must demonstrate prejudice.

### b. No Prejudice From Continuances

A.H. does not contend that he would have obtained a more favorable outcome on the Second Petition if the improper continuances had not been granted. He also does not contend that the improper continuances affected the conservatorship order from which he appeals. Finally, he does not contend that he received an unfair trial. He therefore fails to establish a prejudicial abuse of discretion under Rule 3.1332. (*T.B., supra,* 99 Cal.App.5th at p. 1393 [no reversal where the appellant acknowledged he

25

received a fair trial and did not assert error in the trial court's determination that he was gravely disabled]; *M.M., supra*, 39 Cal.App.5th at p. 501 [no reversible error where, among other things, the appellant acknowledged he received a fair trial and did not assert error in gravely disabled finding].)

Instead, A.H. argues that the improper continuances were prejudicial because his conservatorship would have ended earlier without them. He contends that, if his "trial occurred in Spring 2023, the conservatorship imposed following that trial, would have expired in Spring 2024, and [he] would only be confined now if the government had again proven beyond a reasonable doubt that he was still gravely disabled." While that is true, it is also true that A.H. was deemed to be gravely disabled in January 2024, justifying a conservatorship until January 2025, and A.H. does not challenge that finding here. At any rate, this theory of prejudice has consistently been rejected in this context. (See, e.g., *T.B., supra*, 99 Cal.App.5th at p. 1393; *M.M., supra*, 39 Cal.App.5th at p. 501.) A.H. fails to establish prejudicial error due to the improper continuances.[13]

### c. Harmless Error in Denying Motions to Dismiss

The factors in Rule 3.1332(d) have been assumed to pertain to motions to dismiss LPS conservatorship proceedings as well as requests for a continuance. (*T.B., supra,* 99 Cal.App.5th at pp. 1389, 1391.) To the extent A.H. complains that the trial court abused its discretion in not dismissing the

---

[13] Similarly, A.H. argues: "In the same way a criminal defendant being locked up without a trial for an excessive time suffers prejudice even if he is guilty of the crime, so too was [A.H.] prejudiced by being locked up for an excessive period of time without a trial even if, ultimately, he was found to be gravely disabled." We consider this aspect of prejudice later in this opinion, in the context of his due process claim.

First and Second Petitions, however, the analysis differs somewhat from our analysis of the continuances. Nonetheless, we reach the same conclusion.

A.H. moved to dismiss the First Petition due to the expiration of the temporary conservatorship. On appeal, he does not establish that the trial court lost jurisdiction once the temporary conservatorship expired or was otherwise compelled to dismiss the petition. Moreover, the First Petition was ultimately dismissed, and A.H. does not show that the delay in its dismissal had an adverse effect on the conservatorship proceeding from which he appeals. He therefore fails to demonstrate prejudicial error.

A.H. moved to dismiss the Second Petition on the ground that it was improper to "stack" temporary conservatorships. A.H. urged that this practice would extend an individual's confinement indefinitely without the trial guaranteed by statute. The Public Guardian countered that the LPS Act does not preclude it from filing a new petition and seeking a new temporary conservatorship after the expiration of an earlier temporary conservatorship if each successive petition is supported by a declaration from a medical professional that is reviewed by the trial court before the temporary conservatorship is granted. While that is true, the declaration provided by the medical professional in this case was relatively bare bones and conclusory. But even if it was improper under the LPS Act to stack temporary conservatorships—an issue we do not decide—A.H. does not demonstrate that the remedy would be to dismiss the Second Petition rather than, for example, precluding the second temporary conservatorship.

A.H. also moved to dismiss the Second Petition on the ground that the time to commence trial under section 5350, subdivision (d)(2), had expired. A.H.'s trial demand was on October 11, 2023, requiring trial to commence by October 21, 2023. The trial court denied the motion, citing its discretion.

A.H. does not demonstrate that the court abused its discretion specifically as to this order (apart from his due process arguments, addressed below).

In sum, even if the trial court abused its discretion in granting multiple continuances, A.H. has not shown that he would have obtained a better outcome at the January 2024 trial if the continuances had not been granted. He therefore fails to demonstrate that the conservatorship order should be reversed on this ground.

D. <u>Due Process</u>

A.H. argues that his prolonged involuntary confinement during the lengthy delays in his conservatorship proceedings—stemming from numerous continuances, successive conservatorship petitions, and stacked temporary conservatorships—violated his due process rights under the Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution. We agree.

As explained below, we accept the parties' agreement that the delays in this case should be evaluated using the test announced in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*). The trial court erred because it did not apply the *Barker* test and because A.H. has demonstrated that his due process rights were violated under that test. In particular, the 10-month delay between the filing of the First Petition (which began A.H.'s involuntary confinement pursuant to temporary conservatorship orders) and the finding of grave disability after the trial on the Second Petition was significant. That delay was not attributable to A.H. but to Contra Costa County's system for handling LPS cases. A.H. repeatedly objected to the ongoing delay. And the delay was prejudicial to A.H. under the circumstances, including the fact that A.H. had never previously been found to be gravely disabled and did not have

28

his conservatorship renewed.  Because this delay violated due process, the order conserving him must be reversed.

### 1. Framework for the Due Process Analysis

In criminal cases, our courts analyze a due process claim arising from the delayed commencement of trial using the balancing test announced in *Barker, supra,* 407 U.S. 514.  The factors include the length of the pretrial delay, the reason for the delay, the defendant's assertion of his speedy trial right, and the prejudice to the defendant caused by the delay.  (*Id*. at pp. 530–532.)  None of those factors is dispositive.  (*Id*. at p. 533.)  Nor are they exclusive.  (*Id*. at p. 530.)  The defendant bears the burden of demonstrating a speedy trial violation.  (*People v. Williams* (2013) 58 Cal.4th 197, 233, citing *Barker,* at p. 532.)

In its opening brief, the Public Guardian argued that the *Barker* test does not apply in LPS cases because they are not criminal cases.  The Public Guardian is correct that "[c]onservatorship proceedings are civil in nature, so the constitutional protections afforded criminal defendants do not directly apply." (*Conservatorship of Eric B*. (2022) 12 Cal.5th 1085, 1092; accord, *T.B., supra*, 99 Cal.App.5th at p. 1394; *Conservatorship of Ben C*. (2007) 40 Cal.4th 529, 538 (*Ben C*.).)  By the time it filed its supplemental brief in this case, however, the Public Guardian acknowledged that *Barker* does apply.  As do we.

Instructive on this point is *Camacho v. Superior Court* (2023) 15 Cal.5th 354 (*Camacho*), which applied the *Barker* test to civil proceedings under the Sexually Violent Predator (SVP) Act (§ 6600 et seq.).  Our high court did so because, as in criminal cases, an individual's interest in a timely trial in an SVP case may vary, and it is impossible to define in the abstract what degree of delay may be tolerable.  (*Camacho,* at p. 381.)  The court

29

therefore concluded: "The *Barker* test outlines a broadly relevant set of functional, case-dependent factors to consider in analyzing questions of trial timing. To the extent the SVP context differs from the criminal context in which *Barker* was decided, the flexibility of the test allows courts to account for those differences." (*Ibid*.)

So too with LPS proceedings. Although an individual's interest in a timely trial would likely vary less in LPS cases than in criminal or SVP cases, whether the delay in a LPS proceeding is acceptable depends on a variety of circumstances that the *Barker* test covers. If there is any possibility that prolonged pretrial confinement due to delays in a civil proceeding can violate due process, it would make sense that the length of the delay, the reason for it, the proposed conservatee's objections to it, and the resulting prejudice to the proposed conservatee would be factors to consider.[14]

---

[14] Neither party argues that we should apply the test under *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*) rather than the *Barker* test—an issue currently before our high court in *E.A. Mathews* evaluated under the due process clause procedures for terminating Social Security benefits by considering the private interest affected by the government action, the risk of an erroneous deprivation of that interest through the procedures used, and the government's interest. (*Mathews*, at p. 335.) California courts have applied these principles in LPS cases. (See *Conservatorship of John L.* (2010) 48 Cal.4th 131, 150, 154 (*John L.*) [applying *Mathews* factors "to determine whether a particular procedure or absence of a procedure violates due process"]; *Ben C., supra*, 40 Cal.4th at p. 543 [applying *Mathews* factors in deciding that the LPS Act does not require *Anders/Wende* review].) *Camacho*, however, held that the *Barker* test, rather than the *Mathews* test, was more suitable for deciding whether an alleged SVP was deprived of his constitutional right to a timely trial. (*Camacho, supra*, 15 Cal.5th at pp. 379, 382 [*Mathews* test "is more clearly suited to questions about the adequacy of procedures used in government decisionmaking than to questions about the timing of those decisions"].) We note also that the *Matthews* test does not explicitly consider the prejudice to an individual, because that prejudice has little, if any, relevance when evaluating a procedure that applies to a broader

## 2. The Trial Court's Failure to Apply the *Barker* Test

In A.H.'s October 2023 and December 2023 written motions to dismiss the Second Petition and release him from his second consecutive temporary conservatorship, A.H. argued that the *Barker* factors demonstrated a violation of due process. The trial court denied the October motion solely because the law did not prohibit a second temporary conservatorship. The court denied the December motion because dismissal for a failure to comply with the statutory deadline was not mandatory. At neither time did the court mention the *Barker* factors. Nor did it mention the *Barker* factors in denying A.H.'s other motions to dismiss. While we ordinarily presume that the court knows and applies the law, in this case the record affirmatively demonstrates that the court did not conduct the analysis required by *Barker*. Applying de novo review, we conclude that the court erred. (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463 [de novo review applies in deciding whether the court used an incorrect legal standard in exercising its discretion]; *In re A.B.* (2022) 79 Cal.App.5th 906, 925 [de novo review for due process challenge].)

To determine whether the trial court's failure to apply the *Barker* test was harmless and to decide more generally whether the court erred in denying A.H.'s motions, we next consider how the *Barker* test should have been applied in this case. Upon doing so, we find a due process violation.

---

population. By contrast, prejudice to an individual, an express consideration under *Barker*, is important when deciding whether delays deprived that individual of due process. Because the parties have not raised the issue, we need not consider it further and apply *Barker* pursuant to *Camacho*.

31

### 3. Application of the *Barker* Test

#### a. *The Length of the Pretrial Delay*

The Public Guardian filed the First Petition on February 28, 2023. Because A.H. requested a trial on May 10, his trial was supposed to begin by May 20 under section 5350, subdivision (d)(2). A.H.'s counsel, however, acquiesced in the trial starting on July 25. Trial began one day later. As to the Second Petition, trial was requested on October 11 and was statutorily required to begin by October 21. A.H.'s motions to dismiss the Second Petition for failure to timely commence the trial were denied as late as eight weeks later on December 18, and trial did not begin until January 2, 2024. A.H.'s trial on the Second Petition was thus delayed past the statutory deadline by 10 weeks.

This 10-week delay (and the eight-week delay based on the date the trial court denied the last motion to dismiss) was significant for purposes of the first *Barker* factor. Section 5350 reflects a clear legislative intent that LPS conservatorship trials commence within 10 days after a demand for trial. Over five times that length of time had elapsed when the court ruled on A.H.'s motion to dismiss. This delay weighs in favor of a due process violation.

In addition, A.H. emphasizes another category of delay, which was caused primarily by the continuances granted by the trial court *after* trial began on the First Petition. During those continuances, A.H. remained confined due to two consecutive temporary conservatorships. His essential point is that he was involuntarily confined for months between the time the Public Guardian initially targeted him for conservatorship and the time he finally obtained a ruling on the petitions' allegations of A.H.'s grave

32

disability. We agree that this delay also weighs in favor of a due process violation.

As a threshold matter, the Public Guardian does not appear to dispute that this delay may be considered under the first *Barker* factor. Where, as here, the proposed conservatee has been involuntarily confined pursuant to temporary conservatorships during that delay, we agree with this apparent concession. Given the significant " ' "liberty interests at stake" ' " in a LPS case (*T.B.*, *supra*, 99 Cal.App.5th at p. 1376), the length of a proposed conservatee's confinement before he or she has received the protections of a final LPS conservatorship determination should be considered in any due process analysis.

In evaluating whether this delay supports a due process violation, the parties offer differing calculations. A.H. argues that the delay was 10 months based on the filing date of the First Petition and the completion date of the trial on the Second Petition, which finally adjudicated the grave disability allegations in his conservatorship petitions. Alternatively, A.H. argues that seven months passed between the day trial should have begun on the First Petition pursuant to section 5350 and the day that the Second Petition trial began. By contrast, the Public Guardian argues that the delay was only 161 days (over five months) based on the date of A.H.'s first objection to a continuance (July 25, 2023) and the date his trial on the Second Petition began.

Even if we agreed with the Public Guardian's calculation, a delay of 161 days is just 10 days less than the 171 days that had elapsed between the initial trial demand and trial in *T.B.,* which Division Two assumed would favor a due process violation. (*T.B.*, *supra,* 99 Cal.App.5th at pp. 1373, 1396.) There is also no question that this delay was unreasonable. Although A.H.'s

33

trial on the First Petition purportedly began on July 26, 2023, the first witness was not called until September 26—two months later. The trial court then declared a mistrial on that Petition on November 13—roughly seven weeks later. Ultimately, it took 175 days from the date of his first objection for A.H. to obtain a ruling on the merits of his conservatorship petitions even though the trial itself took only a few days to complete.

In any event, we believe that the relevant period of delay started with the filing of the First Petition (and corresponding temporary conservatorship order) because at that point A.H.'s involuntary pretrial confinement began. From that date (February 28, 2023) to the conclusion of his trial (January 5, 2024), A.H. was confined for 311 days—over 10 months—*without a determination that he was in fact gravely disabled.* It may be that some of this delay is not attributable to the government but that is a matter to consider under a different *Barker* factor.[15]

A.H.'s involuntary confinement for over 10 months without a final adjudication of the merits of the allegations against him was especially significant given the intended time frame for new LPS cases. Section 5352.1 provides that a temporary conservatorship cannot last longer than *seven* months even when extended to allow for trial. Moreover, the Legislature intended that even this extension is inappropriate except for *emergencies.* In

_____

[15] We aggregate the delay under the First Petition and the delay under the Second Petition in our due process analysis because the petitions overlapped and because the corresponding temporary conservatorships were consecutive. Aggregation of those delays is also warranted because the record suggests that the delays in the First Petition's proceedings affected the timeliness of the Second Petition's proceedings. Indeed, the trial court expressly declined to act on the Second Petition while the First Petition was pending. A.H.'s confinement was therefore the product of one continuous effort by the Public Guardian to obtain a permanent conservatorship.

a report on the bill amending section 5350, subdivision (d)(2), the Assembly Committee on the Judiciary stated: "To be clear, extensions of this duration—either six months or 180 days—*should be extremely rare.* The 30-day temporary conservatorship, and its extensions to allow for the potential conservatee's counsel to prepare for trial, are intended to be short-term *emergency* measures before a determination of whether the person is 'gravely disabled' and warrants the establishment of a full LPS conservatorship. *Continuing to hold a person in a temporary conservatorship, which does not provide the same due process protections as a full LPS conservatorship, for all but the most dire reasons is contrary to the LPS Act and its procedural safeguards.*" (Assem. Com. on Jud., Rep. on Sen. Bill No. 1394 (2021–2022 Reg. Sess.), June 21, 2022, p. 4, italics added.)[16]

" Here, the trial on the Second Petition was not completed for over three months *after* expiration of the seven-month temporary conservatorship in the First Petition. This delay weighs in favor of a due process violation.

### b. *Reason for the Delay*

Many, if not all, of the delays in starting the trials and the delays from repeated continuances and successive LPS petitions as A.H. remained involuntarily confined in temporary conservatorships were not attributable to

---

[16] Under section 5352.1, subdivision (d), "[i]f the proposed conservatee demands a court or jury trial on the issue of whether they are gravely disabled, *the court may* extend the temporary conservatorship until the date of the disposition of the issue by the court or jury trial, provided that the extension does not exceed 180 days." (Italics added.) We note that the minute orders recording A.H.'s demand for a jury trial do not show that A.H.'s temporary conservatorship was continued, and we saw no such order in the record. The parties do not raise this issue or address whether A.H. was lawfully confined pursuant to the temporary conservatorships after their 30-day expiration dates. We therefore do not consider these matters in resolving A.H.'s appeal.

A.H. There is no indication in the record that he personally sought or desired any of the continuances. Although A.H.'s counsel agreed to a trial date in July 2023, she objected consistently to continuances of the trial thereafter (even when she was unavailable for trial due to other LPS matters).[17] Counsel was unavailable for trial due to an illness only once, resulting in a mere one-day delay. The Public Guardian's witness was not available that day too, so it appears the trial would not have proceeded anyway.

Although A.H.'s counsel was often unavailable for trial because she was stuck in other LPS proceedings, we decline to hold that against A.H. in our due process analysis. Counsel's unavailability appears to be due to the way that LPS cases are handled in Contra Costa County, which results in an endemic shortage of courtrooms and attorneys available to try them. Indeed, it appears that judges, the Public Guardian, and the public defender are regularly, if not always, booked for multiple LPS trials at the same time.[18] A.H. had no control over the workload of the attorneys, and he had no authority to force the trial court to assign more courtrooms to LPS cases.

Nor were the continuances granted for A.H.'s benefit. (See *In re Butler* (2020) 55 Cal.App.5th 614, 658, overruled on another ground in *Camacho*,

_____

[17] A.H. contends that his counsel's stipulation to the July 2023 trial date should not be held against him because it may have been due to a systemic problem of attorneys being too busy to timely bring an LPS case to trial. There is no direct evidence that this was the reason for counsel's stipulation, although it is not an unreasonable inference from the record.

[18] The fact that there were so many LPS cases awaiting trials for which there were not enough courtrooms or attorneys is apparent from the record. For example, on October 23, 2023, County Counsel advised that A.H.'s trial could not move forward because there were 40 or 45 LPS cases set for trial in any given month. On December 11, 2023, Judge Riebli acknowledged that if the Second Petition were treated as filed in September 2023 (which it was), the trial would be delayed because the case "would be substantially behind other cases that are currently up for trial."

36

*supra*, 15 Cal.5th at p. 392 [although delays caused by the attorney are normally charged to the client, the rule should not apply when the delays are not caused for the client's benefit].) A.H.'s counsel did not delay his trial because she needed more time to prepare (except once, from a morning session to the afternoon, due to her nonstop involvement in other trials). To the contrary, A.H.'s counsel could not proceed because of her workload on other LPS cases and the unavailability of courtrooms.

Under the facts of this case, we need not find a breakdown in the system to conclude that delays attributable to A.H.'s counsel, for the most part, should not be attributed to A.H. under the *Barker* test. In any event, the Public Guardian does not dispute A.H.'s claim that there was such a breakdown due to the failure to devote adequate resources to LPS matters. (See *People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36, 65–73, overruled on another ground in *Camacho, supra*, 15 Cal.5th at p. 392 [systemic breakdown where, among other things, budget cuts in the public defender's office precluded attorneys from handling their caseload in a timely manner and defense counsel was removed before trial].) In the final analysis, A.H. was not the reason for the delays in his trial and confinement.

To be sure, the reason for the delay "is the 'flag all litigants seek to capture' [citation] because the permissibility of pretrial delay depends to a great extent on who bears responsibility for it and why." (*Camacho, supra,* 15 Cal.5th at pp. 383–384 [noting that " '[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered' "].) A.H. has captured that flag here and, in doing so, has established that the reasons for the delay support a due process violation.

### c. *A.H.'s Assertion of His Right to a Speedy Trial*

A.H. did not insist that the trial on the First Petition commence by the statutory deadline but instead agreed to a July 2023 trial date. After July 25, however, A.H.'s counsel consistently objected to the continuances and moved to dismiss the petitions. Because the basis for A.H.'s claim regarding the First Petition is the many continuances that delayed the completion of the trial rather than the failure to commence trial, A.H.'s repeated protests to the court about the time it was taking to resolve the First Petition weigh in favor of a due process violation. Furthermore, A.H.'s counsel consistently objected to delays in the commencement of trial on the Second Petition. The Public Guardian does not argue otherwise. This factor therefore weighs in favor of a due process violation.

### d. *Prejudice to A.H.*

The Public Guardian argues that A.H. has not shown any prejudice because he has not demonstrated that the delays had an "appreciable impact" on his ability to present his case. (*Camacho, supra,* 15 Cal.5th at p. 393; see *T.B., supra,* 99 Cal.App.5th at p. 1396.) As A.H. points out, however, the prejudice discussed in *Barker* and *Camacho* is not limited to adverse effects on the fairness of the trial proceedings. Indeed, our high court has recognized that under the *Barker* test, " '[p]rejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.' " (*Camacho,* at p. 391.)

In the criminal context, *Barker* explained that there are *three* interests to be considered in the prejudice analysis: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker, supra,* 407 U.S. at p. 532.) These considerations make sense in evaluating delays in the

38

completion of trial as well as the commencement of trial since both types of delay extended A.H.'s pretrial confinement. *Camacho* considered these same three interests in the SVP context, with some modifications that we discuss below. (*Camacho, supra*, 15 Cal.5th at p. 391 [recognizing the interests identified in *Barker* but "acknowledg[ing] differences in how the interests arise"].)[19] We do the same here in the LPS context and find sufficient prejudice to support a due process violation.

### i. *Trial Prejudice*

The most serious interest potentially affected by trial delays is A.H.'s interest in presenting a defense at trial—what *Camacho* referred to as "trial prejudice." (*Camacho, supra*, 15 Cal.5th at pp. 391, 392.) In criminal cases, it is *presumed* that a delay in commencing trial is prejudicial because " 'time's erosion of exculpatory evidence and testimony "can rarely be shown." ' " (*Id.* at pp. 391–392.) Therefore, " ' "[a]ffirmative proof of particularized prejudice is not essential to every speedy trial claim," ' " and a presumption of prejudice becomes part of the mix of relevant facts, with its importance increasing with the length of delay. (*Id.* at p. 392.) By contrast, *Camacho* declined to apply "a presumption of trial prejudice [due to delay] in the SVP context," because an SVP trial establishes whether a person meets the definition of an SVP *at the time of trial*, rather than whether the defendant's past conduct constitutes guilt of an offense. (*Ibid.*) Thus, "time ordinarily will not erase

---

19 We are mindful that our Supreme Court granted review in *E.A.* to decide whether a conservatee must "demonstrate prejudice to establish that a 362-day delay in initiating a trial in a [LPS] Act conservatorship proceeding violates due process and equal protection." (*Conservatorship of E.A., supra*, S287241.) Following existing precedent, we assume that A.H. must establish prejudice. If our Supreme Court determines that a showing of prejudice is not required, the conclusion that A.H. suffered a due process violation is all the clearer.

critical evidence for the defense" in an SVP case "since the jury relies on recent expert evaluations to evaluate whether the individual qualifies as an SVP at the time of trial." (*Ibid*.)

It is an open question whether prejudice due to delay should be presumed in LPS cases. On the one hand, an LPS trial—like an SVP trial—establishes whether a person meets the criteria for a conservatorship *at the time of trial*. Thus, delays that unnecessarily extend confinement will usually not erase critical evidence for the defense. On the other hand, our high court has identified other ways that confinement can hamper a proposed conservatee's ability to avoid a grave disability finding and obtain release. The proposed "conservatee is placed at an initial disadvantage because he or she is likely to be confined prior to the trial . . . pursuant to a temporary conservatorship," which "limit[s] the individual's ability to communicate freely with counsel, witnesses, and others in preparation for trial." (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 234 (*Roulet*).) "Moreover, the individual's pretrial behavior during confinement can be and normally is introduced at the grave disability hearing to help justify predictions that the individual is and will continue to be gravely disabled. However, an individual's frantic or desperate reactions to involuntary commitment in a mental hospital do not, in themselves, prove that he is mentally ill." (*Ibid*.)

We need not decide whether a presumption of trial prejudice applies in LPS cases. In the matter before us, A.H. not only presents no evidence that the delays affected his ability to mount a defense at his trial, he makes no argument that such prejudice occurred or even that prejudice should be presumed. A.H. therefore fails to demonstrate this aspect of prejudice.

## ii. *Oppressive Pretrial Confinement*

Our Supreme Court has long recognized that "civil commitment to a mental hospital, despite its civil label, threatens a person's liberty and dignity on as massive a scale as that traditionally associated with criminal prosecutions." (*Roulet*, *supra*, 23 Cal.3d at pp. 223, 235 [requiring proof beyond a reasonable doubt and a unanimous verdict in an LPS trial, noting "the horror experienced by a competent person falsely committed as mentally disturbed"]; see *People v. Burnick* (1975) 14 Cal.3d 306, 319–322 [requiring proof beyond a reasonable doubt in mentally disordered sex offender proceedings, noting that civil commitment entails a " 'massive curtailment of liberty' "].)  The Public Guardian acknowledges this.  They argue, however, that pretrial confinement under a temporary conservatorship is not the same as sitting in jail awaiting trial in a criminal case.  Proposed conservatees are generally held in state hospitals or board and care facilities rather than jail and receive mental health treatment while awaiting trial.

But the fact that LPS confinement is qualitatively different than criminal confinement does not make it irrelevant or insignificant.  Like a proposed conservatee's pretrial confinement, an SVP's pretrial confinement occurs in a hospital rather than jail and, during that confinement, the SVP is offered treatment that might facilitate the individual's release.  (*Camacho*, *supra*, 15 Cal.5th at p. 393)  Despite this, *Camacho* observed that this distinction between pretrial incarceration of SVPs and criminal defendants *"does not, of course, minimize the oppressive nature of involuntary detention awaiting an SVP trial."* (*Ibid.*, italics added.)  Even where confinement is purportedly for the individual's own good, it is still a drastic action.  (*Roulet*, *supra*, 23 Cal.3d at p. 225.)  "[T]he mere fact that appellant found [himself]

41

confined in a hospital rather than a prison does not eliminate the need to protect [him] against false confinement." (*Id*. at p. 227, italics omitted.)

Because pretrial confinement has different ramifications depending on its context, *Camacho* concluded that "[d]etermining how heavily to weigh the prejudice resulting from pretrial custody therefore requires a sensitive inquiry into the circumstances of the case." (*Camacho, supra*, 15 Cal.5th at p. 393.) For example, individuals who have never been adjudicated an SVP might experience greater prejudice from delays and pretrial confinement than a person who was already been deemed an SVP. As our high court explained: "For individuals who have never received a favorable expert evaluation, delay in holding trial will generally entail less prejudice than for individuals who have a more substantial basis for arguing they do not satisfy the criteria for SVP commitment. Where an individual makes such a showing, the amount of prejudice may increase as the length of the delay increases." (*Ibid*.)

As instructed by our high court in *Camacho*, we consider the ramifications of pretrial confinement under a temporary conservatorship in LPS cases, the particular circumstances of A.H.'s case, and the significance of his lack of prior involvement in LPS proceedings. Based on these considerations, we find that A.H.'s lengthy pretrial confinement was prejudicially oppressive.

A temporary conservator in an LPS case may confine the proposed conservatee in a state hospital (§ 5358, subd. (a)(2)), as occurred with A.H. The temporary conservator may also curtail other privileges, including the right to refuse medical treatment. Indeed, the temporary conservator in this case had this power and presumably forced A.H. to receive medical treatment, including psychotropic medications, against his will.

42

A further undeniable circumstance in LPS cases is the stigma that attaches to persons who are confined for mental health reasons. (*Roulet, supra,* 23 Cal.3d at p. 223 [appointment of conservator and forced confinement of the appellant in a mental hospital "*placed a lasting stigma on her reputation,*" italics added]; *In re Roger S.* (1977) 19 Cal.3d 921, 929 (*Roger S.*) [when an individual is confined in a mental hospital, "there is injury to protected interests in reputation [citations], an interest in not being improperly or unfairly stigmatized as mentally ill or disordered."].) As *Roulet* explained: " ' "The former mental patient is likely to be treated with distrust and even loathing; he may be socially ostracized and victimized by employment and educational discrimination. Finally, the individual's hospitalization and posthospitalization experience may cause him to lose self-confidence and self-esteem. . . . The legal and social consequences of commitment constitute *the stigma of mental illness, a stigma that could be as socially debilitating as that of a criminal conviction.*" ' " (*Roulet*, at p. 229, italics added.) But unlike a criminal defendant or SVP who may suffer stigma from pretrial confinement, a proposed conservatee has not been accused of doing anything wrong, much less done anything wrong.

The Public Guardian does not deny that stigma attaches to a proposed conservatee like A.H. who was confined for over 10 months pursuant to a series of temporary conservatorships. Instead, the Public Guardian dismisses any concern about that stigma because "stigma on one's reputation[ ] is one of the reasons there are several safeguards in LPS proceedings, including rehearing ([section] 5364), hearings on placement level and powers and disabilities ([section] 5358.3), writ proceedings ([sections] 5358.7 and 5275), unanimous jury verdict, and a standard of proof beyond a reasonable doubt."

But none of those safeguards were reasonably available to A.H. The cited statutes relate to the standards for determining grave disability at trial or to a conservatee who has already been found at trial to be gravely disabled, not to a person like A.H. who has never been conserved and has only been confined pursuant to a temporary conservatorship. (§§ 5364, 5358.3, 5358.7.) Moreover, sections 5364 (rehearing) and 5358.3 (hearings on placement levels, powers, and disabilities) only became operative on January 1, 2024, just one day before A.H.'s trial on the Second Petition began. In any event, the record shows that these safeguards were not viable options for A.H.: If the trial court could not complete A.H.'s trial in a timely manner, how could it timely address any of these other requests, which would likely necessitate an evidentiary hearing?[20]

The Public Guardian next argues that the word "stigma" is not mentioned in the *Barker* factors so we should ignore it and look instead to see if there is specific evidence of "anxiety and concern," which *Barker* does mention. We disagree. While we do consider A.H.'s anxiety and concern below, stigma is undoubtedly part of the oppressive nature of a proposed conservatee's confinement, as well as part of the conservatee's "concern." The Public Guardian cites no support for its idea that the proposed conservatee must present specific evidence of the stigma recognized in *Roulet*, *Roger S.*,

---

[20] The Public Guardian's claim that A.H. could have filed a petition for a writ of habeas corpus to compel an earlier trial on the Second Petition also misses the mark. (§ 5275.) The mere fact that an LPS defendant (like the criminal defendant in *Barker* and the SVP defendant in *Camacho*) could file a habeas petition does not excuse the failure to dismiss the conservatorship proceedings for a due process violation. Furthermore, habeas is not a suitable alternative. We have no reason to believe that the defense attorneys who are consistently unavailable to try cases would have the time or motivation to file habeas petitions when motions to dismiss should more efficiently accomplish the same result.

and other cases for over four decades.  Nor does the Public Guardian offer any legitimate rationale for ignoring A.H.'s interests in his dignity and reputation.

"       As *Camacho* suggested, it is reasonable to conclude that the oppression of pretrial confinement in LPS cases is more keenly felt by individuals who are not already part of the LPS system.  (*Camacho, supra*, 15 Cal.5th at p. 393.)  A.H. had not been previously adjudicated to be gravely disabled.  Nor was he the subject of a LPS conservatorship petition (as far as the record shows) before the Public Guardian filed the First Petition in February 2023.  Thus, A.H.'s forced hospitalization and treatment during the lengthy delay allowed the Public Guardian to gather far more information to prove that A.H. was gravely disabled than it had before.  The stigma to A.H. from his prolonged pretrial confinement was also greater.  This undoubtedly resulted in prejudice to A.H. given that his lone, one-year conservatorship was *not* renewed.  Indeed, there is no indication that A.H. would have been conserved at all if the trial court had recognized the due process violation.

       Finally, by the time the trial court ruled on A.H.'s motions to dismiss, A.H. was confined on a second consecutive temporary conservatorship pursuant to a second conservatorship petition that overlapped with the first.  This unusual procedural posture only highlights the oppressive nature of the proceedings.[21]  Given all of these circumstances, A.H. has established at least

---

[21] A.H. does not argue on appeal that the Public Guardian is forbidden from filing a conservatorship petition while another petition is pending.  Nor does he argue that the trial court cannot issue a temporary conservatorship immediately after an earlier one expires.  Those issues are therefore not before us.  We only observe that, assuming there is authority for these actions, these unusual circumstances should be considered in evaluating whether the extension of A.H.'s pretrial confinement was prejudicial.

some prejudice arising from the oppression and stigma of his extended, involuntary pretrial confinement in a mental hospital.

### iii. *Anxiety and Concern*

Pretrial confinement by its nature elevates a proposed conservatee's "anxiety and concern" while the conservatee sits in limbo awaiting the conclusion of trial. (*Barker, supra,* 407 US. at p. 532.) This anxiety and concern is presumably heightened where, as here, the proposed conservatee has never been the subject of a conservatorship petition before and has never been conserved or adjudicated to be gravely disabled. (See *Camacho, supra,* 15 Cal.5th at p. 392 ["Being held in anticipation of an SVP trial, like pretrial detention in a jail, unquestionably entails a severe and oppressive restriction on liberty *that may give rise to feelings of anxiety and concern,"* italics added].)

" The Public Guardian contends that A.H. did not present any *evidence* of his anxiety or concern. But he did. Counsel's declaration supporting A.H.'s written motion to dismiss in October 2023 averred that based on her conversation with A.H., he "adamantly contests conservatorship," and she knew he "suffered anxiety and prejudice due to the delay of this matter." Counsel's declaration supporting A.H.'s written motion to dismiss in December 2023 alleged that A.H. had "suffered anxiety" due to the delays, that A.H. said he felt like a " 'victim,' " and that counsel saw A.H. "decompensate due to the continued pro-longed detention." This unopposed evidence demonstrates that A.H., who had never been conserved before, suffered anxiety and concern due to the delays in adjudicating the petitions against him.

### iv. *Conclusion*

The delays in this case kept A.H. confined for 311 days—over 10 months—pursuant to successive temporary conservatorships that were oppressive and stigmatizing. Indeed, the oppression and stigma associated with involuntary pretrial confinement would be particularly acute for A.H., who had never been subject to LPS confinement before and who may never have been conserved if the Second Petition had been dismissed. Because oppression and stigma are difficult to prove here, we consider them established without specific evidence. In addition, there was specific evidence that A.H. had, in fact, suffered anxiety and concern as a result of the delays. For these reasons, there was at least some prejudice arising from the delays engendered by the trial court's continuances and refusals to release A.H.[22]

### e. *Balancing the* Barker *Factors*

The delays in A.H.'s conservatorship proceedings were significant, A.H. was not responsible for them, and A.H., through his counsel, consistently objected to those delays for many months. These factors weigh in favor of a due process violation. Even though the delays had no appreciable effect on

---

[22] There may be other prejudice. Because the trial court's determination of a proposed conservatee's least restrictive placement does not occur until trial, a conservatee may be subjected to inappropriate restrictions while in a temporary conservatorship. Furthermore, the unavailability of courtrooms and counsel may indirectly infringe on the proposed conservatee's right to a jury trial on the issue of grave disability. As in this case, the systemic delays in LPS cases may prompt a proposed conservatee to forego a jury trial to get to trial sooner, since court trials are more easily fit into a busy courtroom schedule. As we also see here, however, that may end up prolonging the conclusion of the trial, because court trials can be held piecemeal as time permits. Indeed, if A.H. had obtained a jury trial, we find it unlikely that his trial would have been continued over the course of several months. Because there is no evidence in the record on these matters, we do not include them in our analysis.

A.H.'s ability to present his defense, they did appreciably prejudice him in other ways, including his reported anxiety and concern over the delays and the oppression and stigma caused by his prolonged, involuntary pretrial confinement. This prejudice is significant here because A.H. had never before been adjudicated as appropriate for the LPS system and did not have his conservatorship renewed. Thus, all the *Barker* factors point to a due process violation. Accordingly, we conclude that the 10-month delay in adjudicating A.H.'s conservatorship petitions and his accompanying involuntary pretrial confinement pursuant to successive temporary conservatorships violated his due process rights. The order of conservatorship must therefore be reversed.[23]

### E. Concluding Observations

For years, this court has expressed disapproval and dismay over the inability to bring LPS cases in Contra Costa County to trial in a timely manner. (E.g., *E.A., supra*, A169299; *T.B. supra*, 99 Cal.App.5th at pp. 1370–1373; see also *Conservatorship of J.Y., supra,* 49 Cal.App.5th at p. 224 [delay of roughly five months to commencement of trial].) The situation does not appear to be getting better despite multiple appellate decisions documenting these significant delays. While we do not doubt the sincerity of individual judges and counsel in dealing with the issue, we question whether the system as presently constructed can give LPS cases the attention they deserve.

We invited the parties to submit supplemental briefing regarding the steps taken by the trial court, the Public Guardian, or the public defender in

---

[23] Because A.H.'s one-year conservatorship expired and the Public Guardian did not seek to renew it, A.H. has been released. We therefore need not address the release issue.

the last three years to reduce delays in LPS cases.[24]  Based on their July 2025 responses, it appears that there is only one judge assigned to LPS cases for all of Contra Costa County (which has a population over 1 million) and that LPS matters are limited to only 50 percent of this judge's time.  Moreover, LPS trials occur just one day a week.

Neither the Public Guardian nor A.H.'s counsel has presented evidence of any concrete steps taken by the trial court, Public Guardian, or public defender to solve the delays.  Instead, the Public Guardian submitted the weekly court calendars for LPS cases in Contra Costa County from January to July 2025.  Each calendar has less than 10 cases and the last two calendars, dated June 30 and July 7, 2025, have only one case.  The Public Guardian proclaims that this shows that the backlog of LPS cases has been cleared and that there is "no current backlog."  It does not.  At most, the calendars tell us that a few LPS trials occur each week.  They do not tell us the number of LPS petitions that remain outstanding, the backlog of LPS trials, or the extent of the delays in adjudicating these matters.  Moreover, the calendars show many LPS matters bearing a case number that begins with "P24," suggesting that the conservatorship petitions in those cases were *filed in 2024* and were scheduled for trial *months* later in 2025.  Five matters have a case number starting with "P23," and two have a case number starting with "P22."  In short, these calendars suggest that significant delays continue to plague LPS cases in Contra Costa County.

We are mindful that the resources of the trial court, the Public Guardian, and the public defender's office are stretched thin, particularly after the pandemic.  We also recognize that the Public Guardian carries out

---

[24] In responding to our request, each party submitted a letter brief and an unopposed request for judicial notice.  The requests are granted.

an important (and perhaps thankless) public service in LPS cases. We imagine that individuals coming to the Public Guardian's attention regularly appear so clearly in need of care and protection that confinement under a temporary conservatorship is necessary for their health and safety. Finally, we understand that the number of LPS defendants demanding a court or jury trial may fluctuate, with the spikes causing a strain on the system. But the Legislature has set forth a timeline for LPS cases with all these concerns in mind, and that timeline must be followed. It is the responsibility of the court, the Public Guardian, and the public defender to dedicate the resources to do so.

## III. DISPOSITION

The order is reversed.

CHOU, J.

WE CONCUR.

JACKSON, P. J.
BURNS, J.

A169588/ *Public Guardian of Contra Costa County v. A.H.*

A169588/ *Public Guardian of Contra Costa County v. A.H.*

Trial Court:       Superior Court of the County of Contra Costa

Trial Judge:      Frank Riebli

Counsel:         Rudolph Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

                  Thomas L. Geiger, County Counsel, and Monica A. Mueller, Deputy County Counsel, for Petitioner and Respondent.

51